1  ALAN EISNER, State Bar #127119
   KESTENBAUM EISNER & GORIN LLP
2  14401 Sylvan Street, Suite 112
   Van Nuys, CA 91401
3  Phone:        (818) 781-1570
   Fax:          (818) 781-5033
4  Email:        ae@keglawyers.com

5  Attorney for Defendant
   JUAN GIL
6

7                    UNITED STATES DISTRICT COURT

8             FOR THE CENTRAL DISTRICT OF CALIFORNIA

9                        WESTERN DIVISION

10

11 | UNITED STATES OF AMERICA  )   Case No.:  2:10-CR-00351-ODW-02
                               )
12 |            Plaintiff,     )   **NOTICE OF MOTION AND**
                               )   **MOTION TO SUPPRESS EVIDENCE**
13 |       v.                  )   **FROM OVERBROAD WIRETAP**
                               )   **ORDERS THAT FAILED TO**
14 |                          )   **IDENTIFY PARTICULAR**
   | ARMANDO BARAJAS, et al.,  )   **EVIDENCE TO BE SIEZED**
15 | JUAN GIL (2)              )
                               )
16 |            Defendant.     )   Hearing Date: July 30, 2012
                               )   Hearing Time: 10:00 a.m.

17

18  TO THE UNITED STATES ATTORNEY ANDRE BIROTTE AND ASSISTANT

19  UNITED STATES ATTORNEY REEMA EL-AMAMY and all interested parties:

20        **PLEASE TAKE NOTICE** that on date or as soon thereafter as this may be heard,

21  in the Courtroom of the Honorable Otis D. Wright, II, defendant Juan Gil by and through

22  his attorney Alan Eisner will and hereby do move to suppress any and all evidence seized

23  or gathered, directly or indirectly, as a result of unlawful electronic eavesdropping and

24  surveillance.

25        This motion is made on the grounds that the wiretap orders in this case were

26  overbroad and failed to identify particular evidence to be seized.

27        This motion is based on this notice of motion, the attached memorandum of points

28  and authorities, all files and records in this case, exhibits, and all evidence to be presented

                                    1

1    at the time and place herein scheduled for the making of this motion.

2

3                                          Respectfully submitted,

4                                          KESTENBAUM EISNER & GORIN LLP

5

6    Dated: June 30, 2012                     */S/ ALAN EISNER*

7                                          ALAN EISNER
                                         Attorney for Defendant

8                                          JUAN GIL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**MOTION TO SUPPRESS EVIDENCE FROM OVERBROAD WIRETAP**

2

**ORDERS THAT FAILED TO IDENTIFY PARTICULAR EVIDENCE**

3

**TO BE SEIZED**

4

5

**INTRODUCTION**

6

Each of the wiretap orders secured by law enforcement in this case is facially

7

defective because it authorized monitoring agents to seize *all* communications carried

8

over a particular phone line without any basis for believing that all communications

9

would be properly seizeable and without regard to whether the communication actually

10

involved subject matter that could properly be seized under 18 U.S.C. § 2518. Any

11

limitation on the scope of the seizures was purely a matter of grace and discretion by the

12

monitoring agents. Because these wiretaps are facially invalid, evidence derived

13

therefrom must be suppressed.

14

15

**STATEMENT OF FACTS**

16

In February 2009, supported by an affidavit from Ontario Police Department

17

Officer Kris Lavoie, the government sought a wiretap on the phone of Defendant Marco

18

Antonio Torres-Cruz, who the government identified as "Alex," and another person

19

allegedly suspected to be Torres-Cruz's source for drugs. The focus of the investigation

20

was, ostensibly, "to identify members and associates of the Ontario Black Angels," which

21

Officer Lavoie characterized as "criminal street gang," even though neither "Alex" nor

22

the reputed "source" were suspected to be associated with the purported "gang." Bates

23

036.

24

The February 13, 2009 wiretap, No. 09-38, sought to target the communications of

25

Manuel Vega, who Lavoie identified as "a known and admitted member of the Ontario

26

Black Angels" but who, Lavoie acknowledged "was the victim of a homicide." Bates

27

28

1    032, 044.[1]  The only other person targeted by the wiretap who was allegedly affiliated

2    with the Black Angels was Defendant David Navarro.  Officer Lavoie hypothesized that

3    "Navarro contacts Alex to collect extortion payments," Bates 032, but the only specific

4    fact offered in support of this hypothesis was the existence of a single, isolated telephone

5    conversation that occurred three months earlier, in November 2008, when Vega was still

6    alive, that Officer Lavoie interpreted as indicating that "'David' assisted Vega by

7    collecting extortion payments."  Bates 041.  Officer Lavoie suspected that "Navarro has

8    taken over the responsibilities of collecting extortion payments" after Vega's death, Bates

9    044, but the affidavit contains no specific fact suggesting any basis for this assertion

10   other than rank speculation.

11          Although purportedly focusing on the Black Angels, the government sought to

12   intercept the communications of 18 specifically identified different living individuals

13   (i.e., not including the deceased Vega), plus "others known, unknown or unidentified" as

14   being among those included identified as "the Target Subjects."  E.g. Bates 005, 097,

15   121, 225, 267, 352, 390, 485, 525, 640, 711, 830, 876, 981.[2]

16          Officer Lavoie acknowledged that there might be telephone communications

17   placed on the targeted telephones where "the Target Subjects, or any of their associates . .

18   . , are not participants in the conversation."  Bates 091.  Officer Lavoie also recognized

19   that the targeted telephones might also be used for ordinary and routine communications

20   that are "not criminal in nature or otherwise related to the offenses under investigation,"

21   that the communications over the telephone lines will include "innocent conversations,"

22

23

24   [1.] Lavoie represented that Vega had been murdered in January 2008, a year earlier,
     Bates 032, 044, even though law enforcement clearly knew that Vega had been killed
25   only a month before the wiretap application, Bates 2830-2910, and had been in
     communication with others in October 2008 and January 2009, more than 9 months to a
26   year after his reported death.  Bates 040, 050, 159, 172, 308.  Vega was, in any event, still
     dead and unlikely to be communicating on any of the target telephones.
27

28   [2.] See also Bates 026, 145, 292, 414, 544, 728, 893 (describing Target Subjects as
     including "and others yet unknown").

1    and that some of the conversations over the targeted telephone will be "privileged."

2    Bates 091.

3            Nonetheless, based on Officer Lavoie's affidavit, the government sought an order

4    providing that "the communications of the Target Subjects and others known, unknown,

5    or unidentified are to be intercepted," Bates 005, 009, including "any background

6    conversations intercepted in the vicinity of [] the Target Telephones."  Bates 009.  The

7    court granted the order requested.  Wiretap Order No. 09-38 authorized the government

8    to seize electronic communications and directed that "The communications of the Target

9    Subjects, and others known, unknown, or unidentified are to be intercepted."  Bates 100.

10   Although Officer Lavoie represented to the court that law enforcement was concerned

11   only about a limited subset of communications over the targeted telephones, the court's

12   order did not place any restriction on the scope or nature of communications that could be

13   intercepted.

14           The process was repeated on approximately monthly intervals until September 25,

15   2009.  In each of these instances, agents were "authorized to intercept wire

16   communications . . . and any background conversations intercepted in the vicinity of []

17   the Target Telephones" and that "The communications of the Target Subjects, and others

18   known, unknown, or unidentified are to be intercepted."  Bates 100, 228, 355, 488, 642,

19   832-33, 983.  As with Wiretap Order 09-38, the subsequent orders did not otherwise limit

20   the type, nature, content, or scope of communications that law enforcement was

21   permitted to intercept and seize for governmental use.

22

23                                    **ARGUMENT**

24       The Fourth Amendment to the United States Constitution, in its elegant simplicity,

25   provides:

26           The right of the people to be secure in their persons, houses, papers, and

27           effects, against unreasonable searches and seizures, shall not be violated,

28           and no Warrants shall issue, but upon probable cause, supported by Oath or

1     affirmation, and particularly describing the place to be searched, and the

2     persons or things to be seized.

3

4  U.S. CONST., amend. IV.

5     The Supreme Court has made clear that the Fourth Amendment "commands that a

6  warrant issue not only upon probable cause supported by oath or affirmation, but also

7  'particularly describing the place to be searched, and the persons or things to be seized.'"

8  *Berger v. New York*, 388 U.S. 41, 55, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), quoting

9  U.S. CONST., amend. IV.  The particularity requirement, the Supreme Court recently

10  emphasized, "stands at the very core of the Fourth Amendment."  *Groh v. Ramirez*, 540

11  U.S. 551, 559, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (brackets omitted).

12     "The manifest purpose of this particularity requirement was to prevent general

13  searches."  *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72

14  (1987).  By insisting on a particularization of what was to be seized by intruding

15  government officials, the Fourth Amendment "repudiated these general warrants and

16  'makes general searches impossible.'"  *Berger*, 388 U.S. at 58 (brackets and ellipses

17  omitted), quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed.

18  231 (1927).

19     An adequately particular warrant "prevents the seizure of one thing under a

20  warrant describing another," *Berger*, 388 U.S. at 58, quoting *Marron*, 275 U.S. at 196,

21  because, "[a]s to what is to be taken, nothing is left to the discretion of the officer

22  executing the warrant." *Berger*, 388 U.S. at 58.  "By limiting the authorization to search

23  to the specific areas and things for which there is probable cause to search, the

24  requirement ensures that the search will be carefully tailored to its justifications, and will

25  not take on the character of the wide-ranging exploratory searches the Framers intended

26  to prohibit." *Garrison*, 480 U.S. at 84.[3]

27  _____

28     [3.] As the Supreme Court explained more recently:
           The problem posed by the general warrant is not that of intrusion *per se*,

1    Even outside the context of wiretaps, "[t]he proceeding by search warrant is a

2   drastic one and must be carefully circumscribed so as to prevent unauthorized invasions

3   of the sanctity of a man's home and the privacies of life." *Berger*, 388 U.S. at 58

4   (internal quotations omitted).  "Few threats to liberty exist which are greater than that

5   posed by the use of eavesdropping devices." *Berger*, 388 U.S. at 63.  Commenting on the

6   Fourth Amendment's demands for particularity, the Supreme Court explained that, "[i]n

7   the wiretap context, those requirements are satisfied by identification of the telephone

8   line to be tapped *and the particular conversations to be seized*." *United States v.*

9   *Donovan*, 429 U.S. 413, 427 n.15, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977) (emphasis

10  added).

11    Title III was enacted in the aftermath of the Supreme Court's decision in *Berger*

12  condemnation of New York's former eavesdropping law as unconstitutional precisely

13  because it "lacks this particularization." *Berger*, 388 U.S. at 55.

14    The Supreme Court expressed concern that "indiscriminate use of such

15  [wiretapping] devices in law enforcement raises grave constitutional questions under the

16  Fourth and Fifth Amendments, and imposes a heavier responsibility on this Court in its

17  supervision of the fairness of procedures." *Berger*, 388 U.S. at 56 (internal quotations

18  omitted).  The Court affirmed that any "order authorizing the use of the electronic

19  device" must "afford[] similar protections to those that are present in the use of

20  conventional warrants authorizing the seizure of tangible evidence." *Id.*, at 57.  The order

21  must "describe the *type of conversation* sought with particularity." *Id.* (emphasis added).

22  An order must be sufficiently definite that "under it the officer could not search

23

24    but of a general, exploratory rummaging in a person's belongings.  The
     Fourth Amendment addresses the problem by requiring a 'particular
25    description' of the things to be seized.  This requirement makes general
     searches impossible and prevents the seizure of one thing under a warrant
26    describing another.  As to what is to be taken, nothing is left to the
     discretion of the officer executing the warrant.
27
28 *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976)
   (brackets, ellipses, quotations and citations omitted).

1 unauthorized areas" and "could not use the order as a passkey to further search." *Id.*, at

2 57.

3       The Supreme Court confirmed that a "'conversation' [is] within the Fourth

4 Amendment's protections, and [] the use of electronic devices to capture it [is] a 'search'

5 within the meaning of the Amendment." *Berger*, 388 U.S. at 51.  The Court struck down

6 the New York law because:

7       It lays down no requirement for particularity in the warrant as to . . . "the

8       place to be searched," or "the persons or things to be seized" as specifically

9       required by the Fourth Amendment.  The need for particularity and

10       evidence of reliability in the showing required when judicial authorization

11       of a search is sought is especially great in the case of eavesdropping.  By its

12       very nature eavesdropping involves an intrusion on privacy that is broad in

13       scope.

14

15 *Berger*, 388 U.S. at 56.

16       Legislating against the backdrop of *Berger*, Congress recognized that wiretapping

17 created peculiar risks where government officials were permitted to eavesdrop on

18 people's private telephone calls:

19       Every spoken word relating to each man's personal, marital, religious,

20       political, or commercial concerns can be intercepted by an unseen auditor

21       and turned against the speaker to the auditor's advantage.

22

23 S. Rep. 1097, 90th Cong., 2nd Sess., at 39, 1968 U.S. Code Cong. & Admin. News 2112,

24 2154 (Apr. 29, 1968).

25

26       Congress therefore commanded that "*each* order authorizing or approving the

27 interception of any wire, oral, or electronic communication under this chapter shall

28 specify . . . *a particular description of the type of communication sought to be*

*intercepted*, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c) (emphasis added).  When adhered to and honored, "The statute does not permit a wide-ranging exploratory search." *United States v. Petti*, 973 F.2d 1441, 1445 (9th Cir. 1992) (internal quotations omitted).

In order to satisfy both the Fourth Amendment and Title III a wiretap order must "'contain a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates.'" *United States v. Carneiro*, 861 F.2d 1171, 1179 (9th Cir. 1988) (citation omitted), *citing United States v. Licavoli*, 604 F.2d 613, 620 (9th Cir. 1979), and *quoting* 18 U.S.C. § 2518(4)(c).

"The plain effect of the detailed restrictions of § 2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and *only to the extent that it is needed*." *Dalia v. United States*, 441 U.S. 238, 250, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) (emphasis added).  Both "Congress and this [Supreme] Court have recognized . . . that electronic surveillance can be a threat to the 'cherished privacy of law-abiding citizens' unless it is subjected to the careful supervision prescribed by Title III." *Dalia*, 441 U.S. at 250 n.9, *citing United States v. United States District Court*, 407 U.S. 297, 312, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

The Ninth Circuit has referred to "the statute's stringent particularity requirements," *United States v. Nerber*, 222 F.3d 597, 605 (9th Cir. 2000), which the Third Circuit described as "necessary in view of the broad invasion of privacy inherent in wiretapping, in order to avoid giving officers 'a roving commission to seize any and all conversations.'" *United States v. Vento*, 533 F.2d 838, 851 (3d Cir. 1976), quoting *Berger*, 388 U.S. at 59.

The orders at issue here make *no attempt* to identify "the type of conversation sought to be intercepted," let alone a "particular description" thereof.

The orders here are in stark contrast to the wiretap orders that have been upheld by other courts.  In *United States v. Kahn*, 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974), for example, the court noted that "By its own terms, the wiretap order in this case

1   conferred authority to intercept only communications '*concerning the above-described*

2   *(gambling) offenses.*'"  *Kahn*, 415 U.S. at 154 (emphasis added).

3          When seeking to investigate the full scope and operations of a narcotics dealing

4   conspiracy, the Ninth Circuit approved an order describing calls to be intercepted in the

5   following terms:

6          [The calls to be intercepted] will be between Joseph Levi Ethridge and his

7          associated [sic] concerning: (1) the date, time, place and manner in which

8          illegal narcotic drugs will be delivered to Joseph Levi Ethridge, and (2) the

9          price Joseph Levi Ethridge is to pay for the illegal narcotic drugs and the

10         date, time, place and manner of payment for said drugs.

11         Also, these wire communications will be between Joseph Levi Ethridge

12         and buyers concerning:  (1) the date, time, place and manner in which

13         illegal narcotic drugs will be delivered to buyers and (2) the price paid for

14         the narcotic drugs, and the date, time, place and manner of payment for said

15         drugs.

16

17  *United States v. Turner*, 528 F.2d 143, 153-54 (9th Cir. 1975) (emphasis added).

18         Similarly, in *United States v. Carneiro*, 861 F.2d 1171 (9th Cir. 1988), the Ninth

19  Circuit upheld a wiretap when "the order only authorized the DEA to intercept those

20  conversations *relating to* the commission of the designated offenses."  *Carneiro*, 861

21  F.2d at 1179.[4]

22

23  ─────────────────

24  [4.] Defendants question whether even this is sufficient narrowing when much more is
    possible.  *See, e.g., Turner*, 528 F.2d at 153-54.

25         Narrow construction of the wiretapping provisions furthers Congress' dual
           purposes for the Act of "(1) protecting the privacy of wire and oral

26         communications, and (2) delineating on a uniform basis the circumstances
           and conditions under which the interception of wire and oral

27         communications may be authorized." *Gelbard v. United States*, 408 U.S.
           41, 48, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), *quoting* S. REP. NO. 90-1097,

28         at 66 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2122, 2153.

1    Although observing that the calls of interest to law enforcement may be placed by

2  the target subjects, the wiretap orders here do not in any way limit interception to the

3  calls of the individuals targeted by the wiretap orders.  Rather, each order expansively

4  provided that "The communications of the Target Subjects, *and others known, unknown,*

5  *or unidentified are to be intercepted,*" Bates 100, 228, 355, 488, 642, 833, 983, regardless

6  of whether anyone participating in the call is associated or affiliated with others involved

7  in illegal activity and regardless of whether anyone participating in the call is involved in

8  any illegal activity.

9    The wiretap orders do not in any way limit the scope of the calls that can be

10  intercepted by law enforcement.  Law enforcement, under the terms of the orders, is

11  entitled to listen to any call placed or received over the target telephones regarding any

12  subject.  The lack of particularization and expansive breadth of these wiretaps is all the

13  more pernicious where, except for a unique occasion, law enforcement has secured

14  permission to eavesdrop on the telephones owned and subscribed to by persons *other*

15  *than* the persons targeted by law enforcement.[5]  No different than the situation in *Berger*

16  that the Supreme Court found constitutionally intolerable, "the conversations of any and

17  all persons coming into the area covered by the device will be seized indiscriminately and

18  without regard to their connection with the crime under investigation."  *Berger*, 388 U.S.

19  at 59.

20    By commanding that law enforcement is, for example, "authorized to intercept

21  wire communications to and from" each target telephone with *no specificity* as to the type

22  of conversations that law enforcement are limited to intercepting, the orders are not

23

24  *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1109-10 (9th Cir. 2005).

25

26  [5.] Simply identifying the persons whose conversations may be listened to is not itself sufficient as it "does no more than identify the person whose constitutionally protected area is to be invaded rather than 'particularly describing' the communications,

27  conversations, or discussions to be seized." *Berger*, 388 U.S. at 59.  Yet, it remains a significant area where these wiretap warrants fell seriously short of what is required by

28  the Fourth Amendment and Title III.

11

1   meaningfully distinguishable from an order that "authorized agents to intercept all wire
2   communications to and from the Target Telephone."   The order's authorization to seize
3   *all* telephone communications simply because the government had probable cause to
4   believe that *some* telephone communications would provide relevant evidence, is akin to
5   a traditional search warrant authorizing the seizure of *all* papers and documents found in
6   a business or residence simply because there was reason to believe that *some* of the
7   papers were subject to seizure.  *E.g. United States v. Spilotro*, 800 F.2d 969, 964 (9th Cir.
8   1986) (warrant was impermissibly overbroad when it "authorized wholesale seizures of
9   entire categories of items not generally evidence of criminal activity, and provided no
10  guidelines to distinguish items used lawfully from those the government had probable
11  cause to seize").

12      The "particularity requirement serves three related purposes:  preventing general
13  searches, preventing the seizure of objects upon the mistaken assumption that they fall
14  within the magistrate's authorization, and preventing the issuance of warrants without a
15  substantial factual basis."  *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984),
16  *citing* 2 W. LAFAVE, SEARCH AND SEIZURE:  A TREATISE ON THE FOURTH AMENDMENT,
17  § 4.6 (1974 and 1984 Supp.).  The wiretap orders undeniably failed in at least the first
18  two of these fundamental purposes.

19      The failure to delimit the scope of the conversations sought by identity of person
20  or by subject matter did in fact "give[] the officer[s] a roving commission to 'seize' any
21  and all conversations." *Berger*, 388 U.S. at 59.  The orders here, "rather than being
22  'carefully circumscribed' so as to prevent unauthorized invasions of privacy actually
23  permits general searches by electronic devices." *Berger*, 388 U.S. at 58.

24      Not meaningfully distinguishable from *Groh*, once the wiretap order identified the
25  phone line that was to be tapped, "the warrant did not describe the items to be seized at
26  all." *Groh*, 540 U.S. at 558.  "[A] search conducted pursuant to a warrant that fails to
27  conform to the particularity requirement of the Fourth Amendment is unconstitutional."
28  *Groh*, 540 U.S. at 559.

1    Even if it be true, it is not enough that the officers "acted with restraint in

2  conducting the search [as] 'the inescapable fact is that this restraint was imposed by the

3  agents themselves, not by a judicial officer." *Groh*, 540 U.S. at 561, quoting *Katz v.*

4  *United States*, 389 U.S. 347, 356, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).  The officers

5  "were not compelled, during the conduct of the search itself, to observe precise limits

6  established in advance by a specific court order. . . .  In the absence of such safeguards,

7  this Court has never sustained a search upon the sole ground that officers reasonably

8  expected to find evidence of a particular crime and voluntarily confined their activities to

9  the least intrusive means consistent with that end." *Katz*, 389 U.S. at 356-57.

10

11                                 **CONCLUSION**

12        For the foregoing reasons, the motion to suppress should be granted.

13

14

15                                        Respectfully submitted,

16                                        KESTENBAUM EISNER & GORIN LLP

17

18  Dated: June 30, 2012              */S/ ALAN EISNER*

19                                        ALAN EISNER
                                          Attorney for Defendant
20                                        JUAN GIL

21

22

23

24

25

26

27

28

13