I, KRIS LAVOIE, being duly sworn, depose and state:

## I.   INTRODUCTION

1.   I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code.  I am empowered to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. Section 2516.

2.   I have been a Police Officer for the Ontario Police Department for approximately 7 years.  I am currently assigned to the High Intensity Drug Trafficking Area, Group 50 (hereinafter referred to as HIDTA 50).

3.   I am a full-time sworn peace officer, and have been employed in such capacity since March 2001.  From March 2001 to June 2006, I was assigned to the Patrol Division, and from June 2006 to the present, I have been assigned to HIDTA 50 as a Task Force Officer (TFO).  HIDTA 50 is a multi-agency task force, which conducts a variety of narcotics investigations, from mid-level narcotics traffickers to major narcotics trafficking organizations.  HIDTA 50 is comprised of various special agents from the Drug Enforcement Administration ("DEA"), Immigration and Customs Enforcement ("ICE"), Internal Revenue Service ("IRS"), and local law enforcement personnel designated as Task Force Officers (TFO's) from the Riverside Police Department ("RPD"), the Riverside Sheriff's Office ("RSO"), the Ontario Police Department ("OPD"), and San Bernardino Sheriff's Department ("SBSD").

4.   I first received training in narcotics and controlled substances laws and investigations at the San Bernardino

Sheriff's Academy in 2000.  Since that time, I have attended over
200 hours of specific training in the investigation of narcotics
and controlled substances offenses, some of which were provided
by the California Narcotics Officers' Association, California
Department of Justice and the Federal Law Enforcement Training
Center.

    5.    I have participated in over 100 narcotics
investigations involving the unlawful importation, possession
with intent to distribute and distribution of controlled
substances (including heroin), as well as the investigative
activity directed at monetary transactions involving the proceeds
of specified unlawful activities and conspiracies, associated
with criminal narcotics offenses in violation of Title 21, United
States Code, Sections 841(a)(1), 843(b), 846, 952(a) and 963,
Title 18, United States Code, Section 924 and California Health
and Safety Code Sections 11351, 11352, 11378, 11379, 11379.6(a)
and conspiracy to commit those crimes in violation of Penal Code
Section 182.  During these investigations, I have conducted
physical surveillance, executed search warrants, arrested several
narcotics traffickers and monitored conversations, pursuant to
Section 629.50 et seq. of the California Penal Code and Section
2518 of Title 18, United States Code.  On numerous occasions, I
have spoken with informants, suspects, defendants and experienced
narcotics investigators concerning the methods and practices of
narcotics traffickers.  Through these investigations, my
training, experience and conversations with experienced agents,
other narcotics investigators and law enforcement personnel, I
have become familiar with the methods employed by narcotics

2

1    traffickers in general, and large Mexican narcotics trafficking
2    organizations in particular, to smuggle, safeguard, distribute
3    narcotics and to collect and launder narcotics-related proceeds.
4    These methods include the use of debit calling cards, public
5    telephones, wireless communications technology, such as paging
6    devices and cellular telephones, counter-surveillance,
7    elaborately planned smuggling schemes tied to legitimate
8    businesses, false or fictitious identities and coded
9    communications in an attempt to avoid detection by law
10   enforcement and circumvent narcotics investigations.

11        6.   I have been the affiant on California State issued
12   wiretap affidavits, and assisted other law enforcement agents in
13   several state and federal wiretap investigations during the past
14   two years.

II.  **PURPOSE OF AFFIDAVIT**

16        7.  On February 13, 2009, the Honorable Manuel L. Real of
17   the United States District Court for the Central District of
18   California issued an order in CR Misc 09-0038-R, authorizing the
19   interception of wire communications of FNU LNU, also known as
20   "Alex," ("ALEX"), David NAVARRO ("NAVARRO"), Steve Osker HOYOS
21   ("HOYOS"), Sara Leticia MISQUEZ ("MISQUEZ"), FNU LNU, also known
22   as Chipo ("CHIPO"), Steven HERNANDEZ ("HERNANDEZ"), Larry CUEVAS
23   ("CUEVAS"), Patrick OROSCO ("OROSCO"), Armando VENEGAS
24   ("VENEGAS"), Richard Castorena ("CASTORENA"), Mario LNU
25   ("MARIO"), Lucio Gallardo Diaz ("DIAZ"), Ray Perez ("PEREZ"),
26   Shawn Young ("YOUNG"), Carmela LNU ("CARMELA"), FNU LNU, also
27   known as Cabezon ("CABEZON"), Gabriel Macias ("MACIAS"), Paul
28   ONSUREZ ("ONSUREZ"), Juan DIAZ ("DIAZ"), FNU LNU ("UM/SOS"),

3

USA000287

1 | Victor Carrasco Felix ("FELIX"), ("JOSE LNU"), ("GILBERTO
2 | GUTIERREZ"), ("JOSE GUTIERREZ"), Teresa Castro ("CASTRO"), and
3 | others yet unknown (the **Target Subjects**") taking place to or
4 | from:

5 |      a Sprint/Nextel cellular telephone subscribed to Ramon
6 |      Ponce, at 10351 Central Avenue, Montclair, CA 91763,
7 |      with a telephone number of 909-631-8843, IMSI[1] #
8 |      000009096368023, and believed to be used primarily by
9 |      FNU LNU, also known as "Alex," ("ALEX"), (**Target
10 |      Telephone #1**), or any subsequently changed telephone
11 |      number assigned to the same IMSI with the same
12 |      subscriber information, and/or any subsequently changed
13 |      IMSI assigned to the same telephone number with the
14 |      same subscriber information; and

16 |      a Sprint/Nextel cellular telephone subscribed to Jose
17 |      Lopez, at 13020 Francisquito Suite 17, Baldwin Park, CA
18 |      91706, with a telephone number of 626-736-0066, IMSI #
19 |      000006262083542, and believed to be used by FNU LNU,
20 |      ALEX's narcotics source of supply who has yet to be
21 |      identified (**"Target Telephone #2"**) or any subsequently

---

[1]   IMSI is an acronym for "International Mobile Subscriber Identity." The IMSI is a unique non-dialable number allocated to each subscriber that identifies subscriber account information (as opposed to the physical telephone equipment) for certain cellular telephones. The IMSI number is unique to that subscriber, and is never re-assigned. Thus, if the target exchanges his cellular telephone for an updated model and also changes his telephone number, the IMSI will remain the same.

USA000288

1          changed telephone number assigned to the same IMSI with

2          the same subscriber information, and/or any

3          subsequently changed IMSI assigned to the same

4          telephone number with the same subscriber information.

5     8.   On March 17, 2009 the Honorable Manuel L. Real of the

6  United States District Court for the Central District of

7  California issued an order in CR Misc 09-38(A)-R, authorizing the

8  interception of wire communications of the **Target Subjects** taking

9  place to or from:

10         a MetroPCS cellular telephone, subscribed to Armando

11         Gonzales at 15576 Merrill Ave., Fontana, California,

12         92335, with a telephone number of 909-251-1663, MEID[2] #

13         268435457101363157, and believed to be used primarily

14         by FNU LNU, also known as "Alex," ("ALEX"), (**Target

           Telephone #3**), or any subsequently changed telephone

16         number assigned to the same MEID with the same

17         subscriber information, and/or any subsequently changed

18         MEID assigned to the same telephone number with the

19         same subscriber information; and

20

21         a Verizon Wireless cellular telephone subscribed to

22         Gabriela Meza, at 1560 Otterbein Avenue, Space 18,

23         Rowland Heights, CA 91748, with a telephone number of

24  _____

25  [2] ESN is an acronym for "Electronic Serial Number." The ESN
26  uniquely identifies certain cellular telephones. MEID is an
    acronym for "Mobile Equipment Identifier." The MEID uniquely
27  identifies certain cellular telephones, and is being used by
    Verizon Wireless on new phones to replace the ESN.
28

USA000289

909-261-9412, ESN/MEID # A0-00000E-57811B, and believed
to be used primarily by DAVID NAVARRO ("**Target
Telephone #4**") or any subsequently changed telephone
number assigned to the same ESN/MEID with the same
subscriber information, and/or any subsequently changed
ESN/MEID assigned to the same telephone number with the
same subscriber information.

The interception of **Target Telephone #3** ended on April 16, 2009.
I discontinued interception of **Target Telephone #4** on April 1,
2009 because I determined that the level of wire communications
over **Target Telephone #4** that were pertinent to this
investigation was low.

9.    During the course of this investigation, I have
previously obtained California state orders authorizing the
interception of wire and electronic communications of various
telephone numbers including **Target Telephone #1**.  Specifically:

i.    On October 14, 2008, the Honorable Judge Kenneth
Barr issued San Bernardino County Intercept Order 2008-83
authorizing the interception of wire and electronic
communications to and from telephone number 909-717-5752;

ii.   On November 12, 2008, the Honorable Judge Kenneth
Barr issued San Bernardino County Intercept Order 2008-83
Extension #1, authorizing the continued interception of wire and
electronic communications to and from telephone number 909-717-
5752;

iii. On November 12, 2008, the Honorable Judge Kenneth
Barr issued San Bernardino County Intercept Order 2008-93
authorizing the interception of wire and electronic

6

USA000290

communications to and from **Target Telephone #1**;

    iv. On December 11, 2008, the Honorable Judge Kenneth Barr issued San Bernardino County Intercept Order 2008-93 Extension #1, authorizing the continued interception of wire and electronic communications to and from **Target Telephone #1**; and

    v. On December 12, 2008, the Honorable Judge Helios Hernandez issued Riverside County Intercept Order 08-62, authorizing the interception of wire and electronic communications to and from telephone number 714-457-7770.

  10. I incorporate by reference my February 13, 2009 affidavit in support of the interception of wire communications to and from **Target Telephone #1**, and **Target Telephone #2**, and my March 17, 2009 affidavit in support of the interception of wire communications to and from **Target Telephone #3**, and **Target Telephone #4** as though fully set forth herein.

  11. I make this affidavit in support of the continued interception of wire communications to and from **Target Telephone #3** as well as the original interception of wire communications to and from:

    a Sprint/Nextel cellular telephone subscribed to Whaterver, Crazt Legs, at 1925 Eloise Way, Upland, CA 91784, with a telephone number of 909-489-8277, ESN # 2684354620058018 and believed to be used primarily by DAVID NAVARRO ("**Target Telephone #5**" and collectively with **Target Telephone #3**, the **Target Telephones**) or any subsequently changed telephone number assigned to the same ESN with the same subscriber information, and/or any subsequently changed ESN assigned to the same telephone number with the same subscriber

1   information.

2        12.   Based on the facts set forth in this affidavit, there

3   is probable cause to believe that FNU LNU, also known as "Alex,"

4   ("ALEX"), David NAVARRO ("NAVARRO"), Steve Osker HOYOS ("HOYOS"),

5   Sara Leticia MISQUEZ ("MISQUEZ"), FNU LNU, also known as Chipo

6   ("CHIPO"), Steven HERNANDEZ ("HERNANDEZ"), Larry CUEVAS

7   ("CUEVAS"), Patrick OROSCO ("OROSCO"), Armando VENEGAS

8   ("VENEGAS"), Richard Castorena ("CASTORENA"), Mario LNU

9   ("MARIO"), Lucio Gallardo Diaz ("DIAZ"), Ray Perez ("PEREZ"),

10  Shawn Young ("YOUNG"), Carmela LNU ("CARMELA"), FNU LNU, also

11  known as Cabezon ("CABEZON"), Gabriel Macias ("MACIAS"), Paul

12  ONSUREZ ("ONSUREZ"), Juan DIAZ ("DIAZ"), FNU LNU ("UM/SOS"),

13  Victor Carrasco Felix ("FELIX"), ("JOSE LNU"), ("GILBERTO

14  GUTIERREZ"), ("JOSE GUTIERREZ"), Teresa Castro ("CASTRO"), and

5   others yet unknown, herinafter, the **"Target Subjects,"**[3] have

16  committed, are committing, and will continue to commit the

17  federal offenses enumerated in 18 U.S.C. § 2516, namely:

18            a.   Racketeer Influenced and Corrupt Organizations

19  ("RICO") offenses, in violation of Title 18, United States Code,

20

21  _____

22  [3] Manuel VEGA ("VEGA") was a known and admitted member of the
23  Ontario Black Angels criminal street gang, who used the gang
    alias of "Limpy."  VEGA either personally collected extortion
24  money from ALEX's organization, or he was assisted by **Target
    Subject** David NAVARRO.  VEGA was a Hispanic Male, born on
25  September 8, 1979.  His California Driver's License Number is
26  B8725308.  VEGA resided at 372 Stillman St. Apt. D, Upland,
    California, 91786, and was the victim of a homicide near his home
27  in Upland on January 13, 2009.  As such, he is no longer
    considered a **Target Subject**.
28

USA000292

1  Sections 1962 and 1963;[4]

2              b.    Violent crimes in aid of a racketeering

3  enterprise, in violation of Title 18, United States Code, Section

4  1959;

5              c.    Manufacture, distribution, and possession with

6  intent to distribute a controlled substance, in violation of

7  Title 21, United States Code, Section 841(a)(1);

8              d.    Conspiracy to distribute a controlled substance,

9  in violation of Title 21, United States Code, Sections 846 and

10  841(a)(1);

11              e.    Importation of a controlled substance into the

12  United States, in violation of Title 21, United States Code,

13  Sections 952 and 960;

14              f.    Conspiracy to import a controlled substance into

    the United States, in violation of Title 21, United States Code,

16  Section 963;

17              g.    Use of a communication facility in committing or

18  in causing or facilitating the commission of a felony narcotics

19  _____

20  [4] There is probable cause that the subject individuals and their
    conspirators constitute an enterprise, that is, a group of
21  individuals associated in fact.  Members and associates of this
    enterprise are believed to have violated 18 U.S.C. § 1962(c)
22  (RICO Substantive) and § 1962(d)(RICO conspiracy), which is
    punishable by 18 U.S.C. § 1963, by conducting and conspiring to
23  conduct the affairs of an association-in-fact enterprise, which
    enterprise engaged in, and the activities of which affect,
24  interstate or foreign commerce, through a pattern of racketeering
    activity consisting of acts involving  narcotics trafficking in
25  violation of Title 21, United States Code, Sections 841 and 846,
    and acts indictable under Sections 1952 , of Title 18, United
26  States Code.  The subject individuals use the target phone to
    arrange and coordinate the activities of this enterprise.
27

28

9

USA000293

1   offense, in violation of Title 21, United States Code, Section
2   843(b);

3           h.    Laundering of monetary instruments, in violation
4   of Title 18, United States Code, Section 1956; and

5           g.    Engaging in monetary transactions in property
6   derived from specified unlawful activity, in violation of Title
7   18, United States Code, Section 1957 (hereinafter referred to as
8   the "**Target Offenses**").[5]

9       13.    This affidavit also seeks authorization to intercept
10  any such wire communications, not only over **Target Telephones**,
11  but also over any changed telephone numbers subsequently assigned
12  to the instruments bearing the same ESN/MEID or ISMI, and any
13  changed ESN/MEID or ISMI subsequently assigned to the **Target**
14  **Telephones**.  This affidavit further seeks authorization to record
5   background conversations in the vicinity of **Target Telephones**
16  while the telephones are off the hook or otherwise in use.

17      14.    Based upon my training and experience, and based on my
18  knowledge of this investigation, there is probable cause to
19  believe the wire communications concerning the **Target Subjects**
20  and others yet unknown concerning the aforementioned offenses
21  will be obtained through the requested wire interception of the
22  **Target Telephones**.  In particular, these communications are
23  expected to reveal:

24          a.    The nature, extent, and methods that the **Target**
25  **Telephones** are used to facilitate the possession with intent to

26  _____

27  [5]    Although not a predicate offense under 18 U.S.C. § 2516 and
28  thus not listed as a **Target Offense**, law enforcement agents are
    also investigating the **Target Subjects** for violation of 18 U.S.C.
    § 2, aiding and abetting the substantive offenses.

USA000294

distribute and distribution of controlled substances and listed chemicals;

   b. The nature, extent, and methods of operation of the **Target Subjects**;

   c. The identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in their illegal activities;

   d. The distribution and transfer of the contraband and money involved in these activities;

   e. The location and source of resources used to finance the criminal activities;

   f. The location and sources of resources used to finance their illegal activities;

   g. The location and disposition of the proceeds from those activities;

   h. The locations and items used in furtherance of those activities.

 15. These communications are expected to constitute admissible evidence of the above-described offenses.

 16. Normal investigative procedures have been tried and have failed to achieve the goals of this investigation, appear unlikely to achieve the goals of the investigation if tried, or are too dangerous to employ.

 17. The information set forth in this affidavit is submitted for the limited purpose of supplying the legal requirements for an order granting authorization for the interception of wire communications on the **Target Telephones**.  It does not contain all of the facts known to this investigation. Information not set forth herein is not relied on for the purpose

USA000295

1    of establishing probable cause for the interception of the wire

2    communications on the **Target Telephones**.

3    III. <u>**BASIS FOR FACTS CONTAINED IN THIS AFFIDAVIT**</u>

4        18.   This affidavit is based on personal knowledge I have

5    gained from my participation in this investigation as well as

6    information from the following sources:

7            a.    Oral and written reports about this and other

8    investigations, which I have received from other law enforcement

9    officers;

10           b.    Physical surveillance conducted by law enforcement

11   officers, which has been reported to me either directly or

12   indirectly;

13           c.    A review of telephone air time and call records;

14           d.    A review of public records, and police reports;

             d.    Debriefings of confidential informants; and

16           e.    Review of intercepted telephone calls with one or

17   more of the **Target Subjects** pursuant to my California state

18   wiretap investigation.  <u>See</u> ¶ 9; and

19           f.    Review of intercepted telephone communications on

20   **Target Telephone #3** and **Target Telephone #4**.

21       19.   Unless otherwise noted, when I assert that a statement

22   was made, I have either heard the statement directly or listened

23   to a recording of the statement or the statement was reported to

24   me by another law enforcement officer, either directly or in a

25   written report.  The officer providing me with the information

26   may have received the information by way of personal knowledge or

27   from another source.

28       20.   Because this affidavit is being submitted for the

limited purpose of seeking authorization for the interception of

USA000296

1  wire communications, I have not set forth every fact known to

2  this investigation.  Facts not set forth herein are not being

3  relied upon in reaching my conclusion that an order should be

4  issued.

5  **IV.  <u>TARGET SUBJECTS</u>**

6      21.  I have obtained information concerning the background

7  of the **Target Subjects** from the following sources and criminal

8  indices: California Department of Motor Vehicle ("DMV"); National

9  Law Enforcement Telecommunications System ("NLETS"); National

10 Crime Information Center ("NCIC"); conversations with other law

11 enforcement officers participating in this investigation; and my

12 own participation in this investigation.  To date, the

13 identifying information that I have ascertained regarding the

14 **Target Subjects** is as follows:

      a.  FNU LNU, also known as "Alex," is the leader of a

16 drug trafficking organization.  ALEX is a mid-level heroin and

17 cocaine dealer who distributes narcotics using street level

18 dealers.  ALEX previously paid extortion money to recently

19 deceased Manuel VEGA, who, in return, allowed ALEX's organization

20 to distribute narcotics in the Ontario, California area.  VEGA

21 was the victim of a homicide near his home in Upland on January

22 13, 2009, however, based on calls previously intercepted on

23 **Target Telephone #1**, I believe that ALEX continues to make

24 extortion payments to VEGA's associate, NAVARRO.  ALEX is a

25 Hispanic male, born on April 16, 1979.  He does not possess a

26 California Driver's License and he is believed to reside at 15544

27

28

USA000297

1    Prairie Way, Riverside, California.[6]

2          b.   David NAVARRO ("NAVARRO") is a known and admitted

3    member of the Ontario Black Angels criminal street gang, who uses

4    the gang alias of "Plucky."  Based on intercepted calls to and

5    from **Target Telephone #1**, and **Target Telephone #3**, I am aware

6    that NAVARRO contacts ALEX to collect extortion payments, and I

7    believe that he continues to collect these payments after VEGA's

8    death.  NAVARRO is a Hispanic male, born on October 22, 1979.

9    His California Driver's License Number is B6405236.  NAVARRO is

10   believed to reside at 1560 S. Otterbein Avenue #18, Rowland

11   Heights, California, 91748.

12         c.   Steve Osker HOYOS ("HOYOS") is a former street-

13   level dealer that distributed narcotics for ALEX.  As discussed

14   below, it is my belief, based on observations by surveillance and

     intercepted communications on **Target Telephone #1** and **Target

16   Telephone #3**, that HOYOS has regular contact with ALEX and still

17   receives narcotics from ALEX's runners.  HOYOS is a Hispanic

18   male, born on September 9, 1964.  His California Driver's License

19   Number is C5980365.  HOYOS is believed to reside at 1254 W. J St.

20   Apt. B, Ontario, California, 91762.

21         d.   Sara Leticia MISQUEZ ("MISQUEZ"), aka Sara

22

23   _____

24   [6]  On October 23, 2008, law enforcement initiated a traffic stop
     on ALEX.  ALEX provided a Mexican identification card bearing the
25   name Marco Antonio TORRES-CRUZ, and provided an address of 15576
     Merrill Avenue in the city of Fontana, California.  However,
26   based on my training and experience, I do not consider ALEX
     positively identified at this time.  Additionally, law
27   enforcement conducted a fingerprint check using a field
     identification unit of ALEX.  The check revealed that ALEX had
28   previously used the name Jose Luis Arreola during a prior contact
     with law enforcement.

USA000298

1  HOLGUIN, aka Sara DELVALLE, was a previous courier for ALEX.

   MISQUEZ is a Hispanic female, born on August 25, 1959.  Her

3  California Driver's License number is C0903027.  MISQUEZ

4  previously resided at 1830 Tam O'Shanter St. Ontario, California,

5  but is presently in custody.

6          e.    FNU LNU, also known as Chipo ("CHIPO"), has acted

7  as a source of supply of heroin for ALEX.  Based on intercepted

8  calls on **Target Telephone #1**, I am aware that either CHIPO or an

9  associate of CHIPO was arrested on November 20, 2008 with

10 approximately 332 gross grams of heroin after leaving ALEX'S

11 residence.  CHIPO or his associate identified himself to law

12 enforcement with a Mexican Driver's License as Kevin Alejandro

13 Martinez-Gonzalez, born on December 11, 1985, and provided an

14 address of 2054 Atlin St. Duarte, California at the time of his

   arrest.  Based on my training and experience, I do not consider a

16 Mexican Driver's License a valid form of identification and CHIPO

17 (or his associate) is not positively identified at this time.[7]

18         f.    Steven HERNANDEZ ("HERNANDEZ"), aka Oscar Rangel,

19 has acted as a cocaine source of supply for ALEX.  HERNANDEZ is a

20 Hispanic male, born on May 28, 1972.  His California Driver's

21 License number is B8258753.  HERNANDEZ is believed to reside at

22 404 Seventh St., Norco, California.

23         g.    Larry CUEVAS ("CUEVAS"), also known as "China

24 Man," was a previous customer and has acted as a courier for

25 ALEX's narcotics trafficking organization.  CUEVAS is a Hispanic

26 _____

27 [7]  I am also aware that CHIPO is presently being investigated by
28 DEA TFO Timothy Harrington in an ongoing unrelated federal
   wiretap investigation.  Additionally, I am aware that TFO
   Harrington believes that CHIPO's moniker is "CHEPO."

USA000299

1  male, born on June 27, 1977.  His California Driver's License
   number is B8143821.  CUEVAS previously resided at 5206 Phillips
3  Blvd., Chino, California, but is currently in custody.

4       h.   Patrick OROSCO ("OROSCO"), is believed to be a
5  narcotics courier for ALEX's organization.  OROSCO is a Hispanic
6  male, born on March 21, 1967.  His California Driver's License
7  number is C4133871.  OROSCO is believed to reside at 10382 Ramona
8  Avenue Apt. F, Montclair, California.

9       i.   Armando VENEGAS ("VENEGAS"), is ALEX's brother-in-
10 law.  Based on intercepted calls on **Target Telephone #1**, I am
11 aware that VENEGAS has distributed narcotics in the Northern
12 California area as part of ALEX's narcotics distribution
13 organization.  VENEGAS is a Hispanic male, born on April 22,
14 1983.  His California Index Number is X7786172.  VENEGAS is
   believed to reside at 793 E. Lewelling Bl., Hayward, California.

16      j.   Richard CASTORENA ("CASTORENA"), is a former
17 customer of ALEX's narcotics trafficking organization, and now
18 assists OROSCO and CASTRO as a street-level courier.  CASTORENA
19 is a Hispanic male, born on November 4, 1952.

20      k.   Mario LNU ("MARIO"), is a customer of ALEX's
21 narcotics trafficking organization, and has yet to be positively
22 identified.

23      l.   Lucio Gallardo Diaz ("DIAZ"), is a Hispanic male,
24 California Driver's License number D8475908, who is believed to
25 reside at 4950 E. Balch Ave. #202, Fresno, CA.  Intercepted calls
26 on **Target Telephone #1** indicate that DIAZ is a source of supply
27 of marijuana for ALEX's organization.

28      m.   Ray Perez ("PEREZ") is a former customer of ALEX's
   organization and a friend of Shawn Young ("YOUNG"), and is now

                                16

USA000300

1   believed to be distributing narcotics for ALEX in the San

2   Bernardino area.   PEREZ has a date of birth of 1/14/1971 and a

3   California Driver's License number A5412600, and is believed to

4   reside at 25364 Fischer St., San Bernardino, CA.

5          n.   Shawn Young ("YOUNG"), also known as "Speedy."

6   Based on intercepted calls on **Target Telephone #1**, I believe that

7   YOUNG has acted as a street level narcotics courier for ALEX's

8   organization.   YOUNG is a Hispanic male, born on July 4, 1972.

9   His California Driver's License Number is A9307919.   YOUNG's

10  residence is unknown.

11         o.   Carmela LNU ("CARMELA"), is ALEX's wife and has

12  yet to be positively identified.   She is believed to reside with

13  ALEX at 15544 Prairie Way, Riverside, California.   Based on

14  intercepted calls on **Target Telephone #1** and **Target Telephone #3**,

    I believe that CARMELA assists ALEX with his narcotics

16  distribution activities.

17         p.   FNU LNU, also known as Cabezon ("CABEZON") is

18  ALEX's brother-in-law, and has yet to be positively identified.

19  Based on intercepted calls on **Target Telephone #1** and **Target**

20  **Telephone #3**, I believe that CABEZON assists ALEX with his

21  narcotics distribution activities.

22         q.   Gabriel Macias ("MACIAS") has acted as a street

23  level courier for ALEX's organization.   MACIAS is a Hispanic male

24  born on April 16, 1989.   His California Driver's License Number

25  is D7907488, and his residence is unknown.

26         r.   Paul ONSUREZ has acted as a street level courier

27  for ALEX's organization.   ONSUREZ is a Hispanic male born on

28  October 10, 1963.   His California Driver's License Number is

17

USA000301

1    C0503421, and his residence is unknown.

2            s.    Juan DIAZ ("DIAZ") is a known and admitted member

3    of the Ontario Black Angels criminal street gang, who uses the

4    gang alias of "Swifty."  Based on my review of previous toll

5    information on **Target Telephone #4**, I believed that DIAZ was

6    communicating with NAVARRO regarding the criminal activity of the

7    Ontario Black Angels street gang.  DIAZ's telephone number has

8    not been identified on **Target Telephone #5**, however, believe that

9    he may be communicating with NAVARRO on a new, yet to be

10   identified telephone number since DIAZ was recently arrested and

11   the released for his suspected involvement in a homicide case.

12           t.    FNU LNU ("UM/SOS") is a heroin and cocaine source

13   of supply for ALEX's narcotics trafficking organization.  He is a

14   Hispanic male with an unknown date of birth, who is believed to

     reside at 1023 10th Street in San Bernardino, California.

16   However, based on my review of intercepted communications on

17   **Target Telephone #3**, I am aware that UM/SOS may have recently

18   been arrested and deported to Mexico.

19           u.    Victor Carrasco Felix ("FELIX") is a heroin source

20   of supply for ALEX's narcotics trafficking organization.  He is a

21   Hispanic male, date of birth 7/30/1983, with an address of 8661

22   Spohn St., Fontana, Ca.

23           v.    JOSE LNU ("JOSE LNU") is believed to be an

24   extortion victim of NAVARRO.  Based on my review of toll

25   information for **Target Telephone #5**, I am also aware that JOSE

26   LNU is presently in contact with NAVARRO, and, based on my

27   training, experience, and knowledge of the investigation, I

28   believe that NAVARRO is presently extorting JOSE LNU in

18

1  connection with JOSE LNU's narcotics trafficking.

2          w.    FNU LNU ("GILBERTO GUTIERREZ") is believed to be a

3  narcotics source of supply for ALEX's narcotics trafficking

4  organization.  On March 31, 2009, GILBERTO GUTIERREZ drove a

5  silver Honda Accord that arrive at ALEX's residence, Ca. Lic.

6  Plate 6GXL941.[8]  Shortly after leaving ALEX's residence on that

7  date, GILBERTO GUTIERREZ and JOSE GUTIERREZ were together found

8  to possess more than $10,000 in cash.  GILBERTO GUTIERREZ is a

9  Hispanic male, believed to have a date of birth 2/13/1959.  See ¶

10  48.  GILBERTO GUTIERREZ did not have a California Driver's

11  license on this date and, based on my training and experience, I

12  do not consider him positively identified at this time.

13  .       x.    FNU LNU ("JOSE GUTIERREZ")[9] is believed to be a

14  narcotics source of supply for ALEX's narcotics trafficking

   organization.  On March 31, 2009, JOSE GUTIERREZ was a passenger

16  in a silver Honda Accord that arrive at ALEX's residence, Ca.

17  Lic. Plate 6GXL941.  Shortly after leaving ALEX's residence on

18  that date, JOSE GUTIERREZ and GILBERTO GUTIERREZ were together

19  found to possess more than $10,000 in cash.  JOSE GUTIERREZ is a

20  Hispanic male, believed to have a date of birth 2/2/1967.  See ¶

21  48.

22          y.    Teresa Castro ("CASTRO"), also known as "Osita",

23  is a street level dealer for ALEX.  She is a Hispanic female,

24

25  _____

26  [8] The vehicle was registered to Hugo OLIVO at 1608 Cleveland St.
   San Bernardino, Ca.

27  [9] JOSE GUTIERREZ is also known as Daniel Quezada, DOB
28  12/12/1967.  I do not consider JOSE GUTIERREZ positively
   identified at this time.

USA000303

1  with a date of birth of 7/28/1961, and California Driver's

2  Licence number C0362731.  While the address on her Driver's

3  License is 1985 Looking Glass Way, Upland, CA, I believe she is

4  presently a transient.

5  **V.   FACTS ESTABLISHING PROBABLE CAUSE**

6  **A.   Overview of the Investigation to Date**

7        22.  This investigation targets ALEX's narcotics

8  distribution activities, including ALEX's source of supply, and

9  also seeks to identify members and associates of the Ontario

10 Black Angels criminal street gang that are involved in the gang's

11 extortion activities.

12       23.  Based on my training, experience, and in speaking with

13 Sgt. Keith Volm, Det. Paul Berdnik, and Cpl. Chris Martinez of

14 the Ontario Police Department, the Ontario Black Angels criminal

   street gang was formed in the 1940s as a car club in the City of

16 Ontario.  The car club evolved into a criminal street gang after

17 warring with other car clubs, and the expansion of the gang is

18 tracked through police contacts and graffiti in the area.

19       24.  Based on my training and experience and my

20 conversations with Sgt. Keith Volm, Det. Paul Berdnik, and Cpl.

21 Chris Martinez of the Ontario Police Department, I am aware that

22 presently, the Ontario Black Angels are the most violent gang in

23 the City of Ontario, and are involved in narcotics trafficking,

24 extortion, hate crimes, and other violent activity including

25 assault and murder.  I am, on those bases, also aware that these

26 crimes are committed in furtherance of the gang, and certain

27 crimes are only committed if authorized by the Mexican Mafia.

28       25.  In June of 2008, Officer Ramiro Martinez of the

USA000304

1  Ontario/Upland Narcotics Task Force (OUNTF) obtained information

2  from a Confidential Source ("CS#1").  CS#1 had agreed to provide

3  information on a narcotics trafficking organization in exchange

4  for consideration in the prosecution of a pending criminal court

5  case.[10]

6      26.  CS#1 told Officer Martinez that MISQUEZ resided at 1830

7  E. Tam O'Shanter St. in Ontario, California, and was responsible

8  for dealing heroin in Ontario and neighboring cities.  CS#1

9  stated MISQUEZ received a daily shipment of narcotics from a

10  source of supply she knew as "Alex," and MISQUEZ employed two

11  runners known as "Linda" and "Weasel."[11]  CS#1 told Officer

12  Martinez that both of these runner drove a green Ford

13  Thunderbird.

14      27.  CS#1 also told Officer Martinez that he/she was aware

    of two telephone numbers used by MISQUEZ.  The first telephone

16  number, (909) 636-9695 was primarily used by the runners, and the

17  second number, (909) 717-5752 was used by MISQUEZ to conduct

18  business.  CS#1 knew MISQUEZ on a personal level, had knowledge

19  of an arrest involving MISQUEZ and a large quantity of narcotics,

20  and while he/she did not admit to using narcotics, he/she did

21  know people who conducted narcotics transactions with MISQUEZ.

22  In July 2008, CS#1 told Officer Martinez that MISQUEZ suspected

23  _____

24  [10] CS#1 has a criminal history which includes narcotics offenses.
    However, the information provided by CS#1 has been corroborated
25  by other investigative means, including surveillance on the
    target subjects, and the information provided by CS#1 is
26  therefore considered reliable.

27  [11] Through the use of the local Ontario Police Department
    database, Officer Martinez was able to learn that HOYOS used the
28  moniker "Weasel."

USA000305

1  that she was being followed and, as a result, MISQUEZ was taking

2  a hands off approach and had changed the vehicle that the

3  "runners" use.  CS#1 told Officer Martinez that MISQUEZ's runners

4  were now driving a black Kia that was previously driven by ALEX's

5  runners, and that ALEX was driving the green Ford Thunderbird.

6      28.  During July and August 2008, members of the OUNTF had

7  established surveillance on numerous occasions at MISQUEZ's

8  residence, 1830 E. Tam O'Shanter St., in Ontario.  While

9  observing MISQUEZ's activities, surveillance units were able to

10  observe individuals later identified as ALEX, a suspected source

11  of supply of narcotics for MISQUEZ, and HOYOS, aka "Weasel," a

12  suspected street level courier for the organization.

13     29.  On July 31, 2008, an examination of the discarded

14  garbage at MISQUEZ's residence revealed mail belonging to Sara

   MISQUEZ, as well as pieces of balloons and foil consistent with

16  the packaging of narcotics.  Additionally, a review of electronic

17  law enforcement records indicated that MISQUEZ has a 1984 felony

18  conviction in Pomona for violations of California Health and

19  Safety Code Section 11378, Possession of a Controlled Substance

20  for Sales, and Health and Safety Code Section 11351, Possession

21  of a Narcotic Controlled Substance for Sales.  MISQUEZ also has a

22  1989 felony conviction in Pomona for a violation of California

23  Penal Code Section 211, Robbery.  In August 2008, Officer

24  Martinez spoke with Detective Stringer of the San Bernardino

25  Sheriff's Department, and learned that Detective Stringer had

26  arrested MISQUEZ in March 2008 for a violation of California

27  Health and Safety Code Section 11351, Possession for Sales of a

28  Narcotic Controlled Substance.  MISQUEZ originally agreed to

22

1   cooperate with law enforcement in return for consideration on her

2   case, but she did not remain in contact with officers, or supply

3   any information.  Criminal charges were subsequently filed

4   against MISQUEZ, and she accepted a plea agreement.  MISQUEZ is

5   presently in custody.

6       30.  On August 8, 2008, surveillance units observed HOYOS

7   briefly meet with two subjects in a parking lot in the 1200 block

8   of W. 4th Street, in Ontario.  HOYOS was seen walking toward the

9   two subjects, one in a vehicle and one on foot, and quickly walk

10  away.  Based on the surveillance officer's training and

11  experience, it appeared HOYOS had completed two narcotics

12  transactions.

13      31.  On September 17, 2008, during a parole search, San

14  Bernardino County Sheriff's Deputy Bannes and members of the

    SMASH Unit received information that a heroin dealer resided at

16  1254 W. J St., Apt. B, in Ontario.  Deputy Bannes contacted

17  HOYOS at the residence, and was able to enter and search the

18  location.  No narcotics were located, but $325.00 in US currency

19  was found with handwritten notes, which based on training and

20  experience, appeared to be pay/owe sheets.  HOYOS told Deputy

21  Bannes the money was for "Alex," a source of supply for

22  narcotics, and HOYOS agreed to call Deputy Bannes when he was

23  going to meet with Alex.[12]

24      32.  On September 18, 2008, Deputy Bannes spoke with

25

26

27  [12] Ontario Police Officer Ramiro Martinez coincidentally drove
    through the neighborhood and noticed the police vehicle near
28  HOYOS' residence.  Officer Martinez spoke with Deputy Bannes and
    advised him of the ongoing investigation involving HOYOS.

23

USA000307

1   Officer Martinez to inform him HOYOS had contacted him.   HOYOS

2   called Deputy Bannes to say he (HOYOS) had met with ALEX to

3   give ALEX the $325.00 US currency and HOYOS had received 75

4   balloons of heroin in return.

5       33.   On September 26, 2008, members of OUNTF established

6   surveillance at HOYOS' residence.   HOYOS was observed driving a

7   green Dodge Caravan, California License Plate 5VLX697.   Officers

8   saw HOYOS meet with several subjects and engage in hand-to-hand

9   transactions, which they believed, based on their training and

10  experience, to be narcotics transactions.

11      34.   On October 14, 2008, the Honorable Judge Kenneth Barr

12  of the San Bernardino County Superior Court, State of

13  California, granted and issued San Bernardino County Intercept

14  Order 2008-83, authorizing interception of wire and electronic

    communications on (909) 717-5752.   On October 17, 2008, an

16  intercepted conversation between HOYOS using (909) 717-5752, and

17  "Limpy" using (909) 373-9361 indicated that "Limpy" received

18  weekly extortion payments from ALEX's narcotics trafficking

19  organization.   After speaking with Ontario Police Gang

20  Suppression Unit's Sergeant Volm, and Detective Berdnik, I

21  learned "Limpy" was the moniker of self-admitted Ontario Black

22  Angel gang member Manuel VEGA.

23      35.   These extortion payments, often called "rent" or

24  "taxes," give ALEX and his narcotics distribution organization

25  the right to sell narcotics in the Ontario area.

26      36.   On November 12, 2008,  the Honorable Judge Kenneth

27  Barr of the San Bernardino County Superior Court, State of

28  California, granted and issued San Bernardino County Intercept

                                24

1    Order 2008-83 Extension #1, authorizing continued interception

2    of wire and electronic communications on (909) 717-5752, and San

3    Bernardino County Intercept Order 2008-93, authorizing

4    interception of wire and electronic communications on **Target**

5    **Telephone #1.**

6        37.   On November 15, 2008, an intercepted conversation

7    between ALEX using **Target Telephone #1**, and "David" using

8    telephone number 909-261-1412, indicated that "David" assisted

9    VEGA by collecting extortion payments from ALEX's narcotics

10   trafficking organization, as well as by collecting money owed to

11   the organization from people who refused to pay debts.

12        a.   After researching the subscriber information on

13   telephone number 909-261-1412, and speaking with Detective

14   Berdnik from the Ontario Gang Suppression Unit, I was able to

15   identify "David" as David NAVARRO, aka "Plucky", a self admitted

16   Ontario Black Angel Gang Member.

17        38.   On November 26, 2008, members of the OUNTF established

18   surveillance at the Jack-in-the-Box located at 10151 Ben Nevis

19   Road, Riverside, California, when telephone intercepts on **Target**

20   **Telephone #1** indicated ALEX would meet with a possible new

21   source of supply, who was, at the time, using (714) 381-6376.[13]

22        a.   Surveillance observed ALEX and the unidentified

23   male ("UM") meet in the UM's vehicle, which was a gold Honda

24   Accord, California License Plate, 4AWW883, registered to Manuel

25

26
     _____

27   [13]  As set in my February 13, 2009 Affidavit, FNU LNU, the source
     of supply, discontinued using telephone number 714-381-6376 and
28   began using **Target Telephone #2**.  However, I am unaware of what
     telephone number FNU LNU is presently using.

USA000309

Francisco Lopez, at 520 Walker Drive, Apartment 48, Mountain View, California.  Intercepted conversations during the meeting indicated that the UM had brought narcotics for ALEX to view, and ALEX discussed prices with his brother-in-law that lives in the bay area.  The UM was followed from the meeting by surveillance units to Carlos and Saul's Appliances at 888 N. Mount Vernon Street in San Bernardino, California.

39.  On December 8, 2008, surveillance was established at ALEX's residence, after an intercepted conversation between ALEX using **Target Telephone #1** and the UM using (714) 381-6376 indicated that the UM would be delivering narcotics to ALEX's residence.  The UM was observed at ALEX's residence in a white Honda Accord, California License plate 6FQD094, registered to Ismael Ordonez, at 316 Escuela Avenue # 102, Mountain View, California.

a.  Surveillance units followed the UM from ALEX's residence to 1023 10th Street in San Bernardino, where another Honda Accord, with California License plate 6CFC072, registered to Victoriano Rojas Garcia, at 520 Walker Drive #48, Mountain View, California, was in the driveway of the residence.

b.  The UM left the residence on 10th Street and arrived at the Carlos and Saul's Appliances, 888 N. Mount Vernon Street in San Bernardino, where surveillance was terminated.

40.  On December 11, 2008, the Honorable Judge Kenneth Barr of the San Bernardino County Superior Court, State of California, granted and issued San Bernardino County Intercept Order 2008-93 Extension #1, authorizing continued interception of wire and electronic communications on **Target Telephone #1.**

26

USA000310

On December 12, 2008, the Honorable Judge Helios Hernandez of
the Riverside County Superior Court, State of California,
granted and issued Riverside County Intercept Order 08-62,
authorizing interception of wire and electronic communications
on (714) 457-7770.

41.   On December 28, 2008, it was learned through
intercepted conversation between ALEX using **Target Telephone #1**,
that the UM had changed his telephone number to **Target Telephone
#2**.

42.   On January 5, 2009, surveillance was established at
ALEX's residence after intercepted conversation on **Target
Telephone #1** indicated that the UM, using **Target Telephone #2**,
would be picking up a load of narcotics that was of poor quality
from ALEX.   The UM arrived at ALEX's residence in a previously
identified Honda Accord, California License plate 6FQD094, <u>see</u> ¶
39, and was followed away by surveillance units when he left.

a.   At approximately 10:24 a.m., while surveillance
units followed the UM northbound on the 215 freeway, Officer
Martinez placed a ruse call to **Target Telephone #2**.   At the time
of the call, surveillance observed the UM answer the telephone,
and when the UM finished the conversation, Officer Martinez
informed me that he had spoken to the UM.

b.   Surveillance followed the UM to the Carlos and
Saul's Appliances at 888 N. Mount Vernon Avenue, after he
circled a nearby neighborhood employing what appeared to be
counter-surveillance tactics.   The UM left the Mount Vernon
location and drove to the 1023 10th Street residence at
approximately 10:50 a.m.   Surveillance followed the UM to 2550

USA000311

N. Macy St. in San Bernardino, California, before he returned to
the 1023 10th St. address.  At approximately 1:35 p.m.,
telephone intercepts between ALEX using **Target Telephone #1** and
the UM using **Target Telephone #2** indicated that the UM was with
his source of supply, and that the UM was attempting to ensure
the new load of narcotics would not be the same poor quality as
the last one.  While attempting to follow the UM in the area of
Glen Avon, California, the UM was able to use counter-
surveillance techniques to evade officers.  Surveillance was
terminated when officers were unable to relocate him or his
vehicle.

43.  On January, 13, 2009, I was contacted by Officer
Ramiro Martinez, who informed me that Manuel VEGA, aka Limpy,
had been murdered near his residence in Upland, California.
VEGA had been shot in the back of the head one time, his
assailant was unknown, and the investigation is in progress.
Since VEGA's murder, based on intercepted ccommunications on
**Target Telephone #1**, and **Target Telephone #3**, I believe that
NAVARRO has taken over the responsibilities of collecting
extortion payments, and is now responsible for sending the funds
to the members of the Mexican Mafia.

B.  <u>Intercepted Communications on Target Telephone #3</u>

44.  **Target Telephone #3** has been identified as a cellular
telephone used by ALEX.  Communications during the interception
period for **Target Telephone #3** have demonstrated that the **Target
Subjects** actively use **Target Telephone #3**, to commit the **Target
Offenses**.  Discussion of the intercepted communications obtained
during the initial period of interception is discussed herein.

USA000312

1    1.   **March 21, 2009**

2       45.   On March 21, 2009, at approximately 10:05 a.m., ALEX

3    made an outgoing call on **Target Telephone #3** to Steve HOYOS at

4    telephone number 909-391-1059.   During this Spanish language

5    conversation, HOYOS told Alex he was going to Mexico, and when

6    Alex asked why, HOYOS told him "you know why."[14]   HOYOS told Alex

7    he was going for "yerba" (Spanish for weed).   HOYOS asked if

8    ALEX could do him a favor and give him "one bag" right now.

9    Alex asked a bag for what, and HOYOS answered for him, and

10   clarified "a dime."   ALEX told HOYOS "later on."

11       a.   Based on my training, experience, and knowledge

12   of the investigation, I believe that, during this conversation

13   between ALEX and HOYOS, HOYOS told Alex that HOYOS was going to

14   Mexico to transport a load of marijuana back into the United

     States.   I believe that when HOYOS asked ALEX for "one bag" or

16   "a dime," HOYOS is referring to a $10.00 quantity of narcotics,

17   possibly heroin, and that HOYOS had informed ALEX that HOYOS was

18   going to Mexico to obtain marijuana so that ALEX would be aware

19   that HOYOS was obtaining narcotics to sell and that HOYOS would

20   be able to pay ALEX back for the narcotics that HOYOS wanted

21   from ALEX.

22       b.   After this intercepted communication on **Target

23   Telephone #3**, Immigration Customs and Enforcement ("ICE") Agent

24   Jay Call entered HOYOS' information into a computer database to

25   have HOYOS inspected further if he were to be encountered at the

26   _____

27   [14] The words contained in quotation marks in Spanish language
     conversations throughout the affidavit are translations made by
28   the certified Spanish language interpreters monitoring the
     intercepted calls.

border.  On March 21, 2009, HOYOS was stopped attempting to re-
enter the United States from Mexico with 31 kilograms of
marijuana.  See ¶ 69 below.

    2.  **March 22, 2009**

    46.  On March 22, 2009, at approximately 11:58 a.m., ALEX
received an incoming call on **Target Telephone #3** from an
unidentified male ("UM #1") using telephone number 909-349-9554.
During their Spanish language conversation, UM #1 asked ALEX if
"that" had sold, and Alex replied it was "weak."  UM #1 said
that "they" were going to arrive on Tuesday.

    a.  Based on my training, experience, and knowledge
of the investigation, when UM #1 asked if "that" had sold, I
believe that UM #1 was referring to narcotics that UM #1 had
supplied to ALEX, and that ALEX's reply that it was "weak" is an
indication that ALEX had received poor quality narcotics.  Based
on my training, experience and knowledge of the investigation, I
also believe UM #1 is a source of supply of heroin for ALEX, and
the arrival on Tuesday refers to a new load of narcotics that
will be delivered on that date.

    3.  **March 27, 2009**

    47.  On March 27, 2009, at approximately 8:41 p.m., ALEX
received an incoming call on **Target Telephone #3** from another
unidentified male ("UM #2") using 951-445-8759.  During their
Spanish language conversation, UM #2 stated a guy called to say
"new shrimp" had arrived, so UM #2 thought to call ALEX so that
ALEX could "sample a plate" and "see how they could do it for
next time."  ALEX and UM #2 agreed to meet the following day.

    a.  Based on my training, experience, and knowledge

USA000314

of the investigation, I believe that the "new shrimp" UM #2 is
referring to is a new load of heroin, and that UM #2 is offering
a sample to ALEX.  I also believe that UM #2 is a second source
of supply of heroin for Alex, and when UM #2 refers to seeing
"how they could do it for next time," I believe that they are
talking about making arrangements for future narcotics
shipments.

    **4.**   **March 31, 2009**

    48.  On March 31, 2009, at approximately 10:17 a.m., ALEX
received an incoming telephone call on **Target Telephone #3** from
UM #2 using telephone number (941) 445-8759.  During their
Spanish language conversation, UM #2 told ALEX he could not find
any, it was kind of hard to get, and they "just got some," but
he (UM #2) has one of the ones "to go to sleep" left.  UM #2
asked how ALEX was doing, and ALEX replied he had about "half of
one."  UM#2 said it was up to ALEX because then it would be hard
to get/find.  ALEX says yes, at least two.  UM#2 said he would
take what he usually brings him.

    a.  Based on my training, experience, and knowledge
of the investigation, I believe that during this call, UM #2 was
making arrangements to deliver narcotics to ALEX.  I believe
that when UM #2 says that he "just got some," UM #2 is
indicating that he just obtained a new shipment of narcotics,
and that the ones "to go to sleep" refers specifically to UM #2
obtaining a heroin shipment.  Based on my training, experience,
and knowledge of the investigation, I believe that when ALEX
replied that he had a "half of one," I believe that he is
advising UM #2, that he (ALEX) has a half ounce of heroin left.

USA000315

1    At approximately 10:35 a.m. on March 31, 2009, I established

2    surveillance at ALEX's residence at 15544 Prairie Way,

3    Riverside, Ca. in anticipation of UM #2's delivery.  I contacted

4    Officer Ramiro Martinez of the Ontario Upland Narcotics Task

5    Force (OUNTF) and a surveillance team responded to the location.

6         b.   At approximately 10:36 a.m., ALEX made an

7    outgoing call on **Target Telephone #3** to UM #2 on telephone

8    number (951) 445-8759.  During their Spanish language

9    conversation, ALEX asked what time UM #2 would be going over.

10   UM #2 said he was getting "that" ready and would go over as soon

11   as he was done.  ALEX said alright, and UM #2 asked if ALEX

12   would wait for him.  ALEX said yes.  Based on my training,

13   experience, and knowledge of the investigation, I believe that

14   the "that" UM #2 is referring to is the shipment of narcotics he

     is getting ready to deliver to ALEX.

16        c.   At approximately 11:20 a.m., I observed a silver

17   Honda Accord arrive at ALEX's residence, Ca. Lic. Plate Number

18   6GXL941, registered to Hugo OLIVO at 1608 Cleveland St. San

19   Bernardino, Ca.   At approximately 11:20 a.m., ALEX received an

20   incoming call on **Target Telephone #3** from UM #2 using (951) 445-

21   8759.  During the Spanish language conversation, UM #2 asked

22   what was up, and ALEX said he was there.

23        d.   At approximately 12:20 p.m., the Honda Accord

24   left the residence and surveillance units followed it to

25   Ontario, Ca. with the assistance of the Ontario Air Unit.  The

26   vehicle exited Mountain Ave. from the 10 Freeway, and was

27   followed to 1031 W. B St. where the two Hispanic male occupants

28   were observed entering an unknown apartment.  At approximately

USA000316

1:08 p.m., the two subjects were observed leaving the apartment
complex in the Honda Accord, and were followed to the Mariscos
Enrique restaurant located on the southwest corner of Mission
Blvd. and Mountain Ave.   A traffic stop was coordinated with an
Ontario Police Unit, and at approximately 2:00 p.m. Corporal
Mike Lorenz and Officer James Flesher stopped the vehicle for
traveling 50 mph in a 40 mph zone in the area of Mountain Ave.
and Francis St.   The driver identified himself as Gilberto
GUTIERREZ, DOB: 02/13/1959, and the passenger identified himself
as Jose GUTIERREZ, DOB: 02/02/1963.   The driver did not possess
a California Driver's License, and both subjects were asked to
exit the vehicle.   Consent was obtained from both subjects to
search their persons and the vehicle.   Gilberto GUTIERREZ had
$3,000.00 US Currency in his possession, Jose GUTIERREZ had
3,890.00 US Currency in his possession, and $5,000 US Currency
was located in the center console area of the vehicle.   A
narcotics detecting canine was requested, and Detective Scott
Anderson responded to the traffic stop.   The canine alerted on
the money found inside the vehicle, and both subjects were taken
into custody for further investigation of narcotics trafficking.

      e.   At the Ontario Police Department, both subjects
were interviewed after waiving their Miranda Rights.   Both
subjects stated the money in their possession was to purchase
used vehicles.   Gilberto GUTIERREZ stated the $5,000.00 in the
vehicle and the $3,000.00 on his person belonged to him, and he
did not know how much money his brother had.   Jose GUTIERREZ
initially stated all the money belonged to his brother, and
whatever money he had in his possession was given to him by his

USA000317