ALAN EISNER, State Bar #127119
KESTENBAUM EISNER & GORIN LLP
14401 Sylvan Street, Suite 112
Van Nuys, CA 91401
Phone:       (818) 781-1570
Fax:          (818) 781-5033
Email:       ae@keglawyers.com

Attorney for Defendant
JUAN GIL

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Case No.: 2:10-CR-00351-ODW-02 |
| ) | |
| Plaintiff, ) | **DEFENDANT JUAN GIL'S MOTION TO SUPPRESS WIRETAP EVIDENCE BASED ON FAILURE TO DEMONSTRATE NECESSITY AND MISREPRESENTATIONS UNDERMINING NECESSITY; DECLARATION** |
| v. ) | |
| ) | |
| ARMANDO BARAJAS, et al., ) | |
| JUAN GIL (2) ) | |
| Defendant. ) | Hearing Date: October 15, 2012 |
| | Hearing Time: 10:00 a.m. |
| | Hon. Otis Wright II |

TO THE UNITED STATES ATTORNEY ANDRE BIROTTE AND ASSISTANT

UNITED STATES ATTORNEY REEMA EL-AMAMY and MICHAEL DORE:

        PLEASE TAKE NOTICE that defendant Juan Gil, through counsel, hereby moves

to suppress wiretap evidence based on failure to demonstrate necessity and

misrepresentations undermining necessity.

                                Respectfully submitted,

                                KESTENBAUM EISNER & GORIN LLP

Dated: September 17, 2012            _/S/ ALAN EISNER_____

                                ALAN EISNER
                                Attorney for Defendant
                                JUAN GIL

**MOTION TO SUPPRESS WIRETAP EVIDENCE**

**BASED ON FAILURE TO DEMONSTRATE NECESSITY AND**

**MISREPRESENTATIONS UNDERMINING NECESSITY**

Crawl.  Walk.  Then run.

In February 2009, the government sought a wiretap to intercept the conversations of individuals who were either already the targets of other active wiretaps, already cooperating as informers, already in police custody, or were already dead.

Rather than undertake the basic investigative tasks necessary to demonstrate the need for a wiretap, the government initiated its investigation of new targets by simply applying for a wiretap.  The question presented in this motion is whether the Congressional limitation on resort to wiretapping only in situations where traditional methods have "been tried and failed," "reasonably appear to be unlikely to succeed," or are demonstrated to be "too dangerous," 18 U.S.C. § 2518(3)(c), can be satisfied by a law enforcement officer's asserted belief that wiretapping can be done more "effectively and efficiently" than commencing with traditional police investigative work.

**STATEMENT OF FACTS**

In February 2009, the government applied for the first in a series of wiretaps.  The government identified two main targets: persons supplying drugs to and distributing drugs for a man identified as "Alex" and the "Ontario Black Angels," a group that the affiant characterized as "criminal street gang," even though neither "Alex" or those he worked with were suspected to be associated with the purported "gang."  Bates 036.[1]

"Alex," his suspected sources, and the persons suspected to be distributing under him were already the targets of wiretaps authorized by the Riverside and San Bernardino Superior Courts.

---

[1.] In October and November of 2008, local authorities established wiretaps on Alex, claiming to focus only on investigating Alex and those he dealt with.  The last state wiretap expired January 12, 2009.  One month later, federal authorities began overseeing the case and added the Black Angels as their investigative focus.

The only persons supposedly associated with the reputed Ontario Black Angels were Manuel Vega and David Navarro.  The affiant, Officer Kris Lavoie, stated that Manuel Vega was "a known and admitted member of the Ontario Black Angels."  Lavoie affirmed, also, however, that Vega "was the victim of a homicide" over a year earlier.  Bates 032, 044.[2]

The only other person targeted by the wiretap who was allegedly affiliated with the Black Angels was Defendant David Navarro.  Officer Lavoie hypothesized that "Navarro contacts Alex to collect extortion payments," Bates 032, but the only specific fact offered in support of this hypothesis was the existence of a single, isolated telephone conversation that occurred three months earlier, in November 2008, when Vega was still alive, that Officer Lavoie interpreted as indicating that "'David' assisted Vega by collecting extortion payments."  Bates 041.  Officer Lavoie suspected that "Navarro has taken over the responsibilities of collecting extortion payments" after Vega's death, Bates 044, but the affidavit contains no specific fact suggesting any basis for this assertion other than rank speculation.

As the wiretapping extended, the number of people whose conversations the government sought to intercept expanded exponentially.  The on-the-ground gumshoe work, however, remained stagnant.

## ARGUMENT

As a pre-condition to issuing a wiretap, the court must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  The supporting affidavit "*must recite facts* indicating that 'normal investigative procedures

---

[2.] Lavoie represented that Vega had been murdered in January 2008, a year earlier, Bates 032, 044, even though law enforcement clearly knew that Vega had been killed only a month before the wiretap application, Bates 2830-2910, and had been in communication with others in October 2008 and January 2009, more than 9 months to a year after his reported death.  Bates 040, 050, 159, 172, 308.  Vega was, in any event, still dead and unlikely to be communicating on any of

have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. McGuire*, 307 F.3d 1192, 1196 (9th Cir. 2002), quoting 18 U.S.C. § 2518(3)(c).

"The purpose of the necessity requirement is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988), citing *United States v. Kahn*, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974).

The Ninth Circuit has repeatedly affirmed that "a wiretap cannot be the initial step in a criminal investigation." *Carneiro*, 861 F.2d at 1181. Satisfying the necessity element requires "a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." *McGuire*, 307 F.3d at 1196, citing *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir.1986). "A district court must reject a wiretap application if law enforcement officers have not first attempted, without success, traditional investigative methods that 'easily suggest themselves and are potentially productive and not unduly dangerous.'" *Carneiro*, 861 F.2d at 1176, quoting *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985). See also *Carneiro*, 861 F.2d at 1181, citing *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); *Brone*, 792 F.2d at 1506.

The necessity requirement may not be dispensed with after the initial wiretap has been justified. "*Each* wiretap application, standing alone, must satisfy the necessity requirement." *Carneiro*, 861 F.2d at 1176, citing *Brone*, 792 F.2d at 1507. Moreover, "It is not enough that the agents believe the telephone subscribers they wish to tap are all part of one conspiracy." *United States v. Abascal*, 564 F.2d 821, 826 (9th Cir. 1977). Rather, "[t]here must be a showing of necessity with respect to each telephone and conspirator." *Carneiro*, 861 F.2d at 1182. See also *United States v. Gonzalez, Inc.*, 412 F.3d 1102 (9th Cir. 2005).

It is not enough that law enforcement demonstrate necessity. In order for the

the target telephones.

wiretap judge to make an informed decision as to whether necessity has been shown, Congress demanded that the affidavit made "*a full and complete statement* as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Carneiro*, 861 F.2d at 1176.

"In addition to determining whether the statutory requirements were met, a district court reviewing the validity of a wiretap order must examine the application to see if it contained material misstatements or omissions regarding the necessity of the wiretap." *Carneiro*, 861 F.2d at 1176, citing *Ippolito*, 774 F.2d at 1485-86. "If an application is inaccurate, the reviewing court must determine the true facts and rely on the credible evidence produced at the suppression hearing to determine whether 'a reasonable district court judge could have denied the application because necessity for the wiretap had not been shown.'" *Carneiro*, 861 F.2d at 1176, quoting *Ippolito*, 774 F.2d at 1486-87, and *United States v. Simpson*, 813 F.2d 1462, 1472 (9th Cir. 1987).

# I.  Law Enforcement Failed to Provide a Full and Complete Statement that any of the Wiretaps was Necessary

In each of the wiretap affidavits, the affiant unequivocally stated: "I have not set forth every fact known to this investigation" and the affidavit "does not contain all of the facts known to this investigation." Bates 29 ¶ 14; Bates 30 ¶ 17.[3] Such a confession and disclaimer is the antithesis of a "full and complete statement."

As demonstrated in the accompanying motion to suppress based on inadequate showings of probable cause, the frequent lack of explanation to demonstrate probable cause for the individual targets itself corroborates law enforcement's deliberate decision to not provide the wiretap judge with a "full and complete" statement of probable cause or necessity. It is also noteworthy that the affiant rarely, if ever, identified the criminal

---

[3.] Officer Lavoie made the same admissions in each extension of the original wiretap. 09-38(A) Bate 148-49 ¶¶ 15, 18; 09-38(B) Bates 295, 297 ¶¶ 17, 20; 09-38(C) Bates 417-18 ¶¶ 18, 21; 09-38(D) Bates 552-53 ¶¶ 22, 25; 09-38(E) Bates 737-38 ¶¶ 25, 28; 09-38(F) Bates 903-05 ¶¶ 27, 30.

history of the target subjects, thereby obscuring law enforcement's legitimate alternative methods of making contact, conducting interviews, and carrying out searches.

## II.   Law Enforcement Failed to Demonstrate Necessity for the Original 09-38 Wiretap

### A.   The Black Angels Investigation

The affidavit in support of the wiretap identified only a single action taken, prior to applying for a wiretap, in furtherance of investigating any suspected criminal activity by Navarro, the dead Vega, or anyone else associated with the Ontario Black Angels: Five weeks before applying for a wiretap, on January 7, 2009, law enforcement "established surveillance at Navarro's residence" for an unspecified time and the "officers were unable to locate Navarro or any vehicles at the location."  Bates 079 ¶ 62.q.

Based on nothing more than this single, feckless attempt at surveillance, Officer Lavoie suggested that any further attempts to investigative the Black Angels would be fruitless.[4]

Law enforcement did not attempt additional surveillance.  Law enforcement did not seek to review property or utility records.  Law enforcement did not seek a mail cover with which they could confirm the identity of the people residing at Navarro's home and learn which banks and financial institutions sent him statements, from which they could determine where his finances were located and then follow-up with subpoenas to those institutions.

---

[4.] In fact, law enforcement seriously misrepresented the effectiveness of surveillance. Although mentioning the January 7, 2009 unsuccessful attempted surveillance of Navarro – which is nowhere corroborated by the discovery – Officer Lavoie omitted that law enforcement returned a week later on January 15, 2009 (still a month before the wiretap application) where they saw a car parked at Navarro's home, saw him exit his home and get into the car, and then followed Navarro taking his child to school and returning home again before deciding to terminate surveillance.  Bates 1315-16, 4148-49.  During this brief period, officers confirmed that the person was Navarro as well as the color, make, model, of his car as well as the license plate on his vehicle if they were paying attention.  *Id.*

Law enforcement believed that roughly 250 individuals associated with the Black Angels.  Indictment 3 ¶ 4.  Officer Lavoie did not suggest any reason for not contacting a single one of them other than that, "in the past," interviews of members at large "have yielded limited information."  Bates 061.  Officer Lavoie stated nothing more about those alleged interviews such as when they occurred.  If the only interviews occurred years earlier, it was entirely plausible that the membership had changed or that internal dynamics within the group might have changed.  Officer Lavoie did not provide the wiretap judge with sufficient factual information from which he could make that determination.

Second, by describing information provided by informers as "limited" without explaining what the information consisted of or related to, the affiant gave the wiretap judge no basis for determining whether the additional interviews should be attempted before resorting to a wiretap.  Interviewing only the omniscient is not the standard.  Everyone's information is "limited."  That is why most trials involve more than one witness.  But that does not mean that interviews will be "unlikely to succeed if tried" and useless towards building a case.  If the information generated from past interviews consisted of the membership roster, the members' respective roles, and their methods of operation, the information could be characterized as "limited" to those subjects while at the same hardly characterizable as unlikely to advance the investigation.[5]

The affiant concealed from the wiretap court that law enforcement had already successfully recruited other members of the Black Angels to serve as informers against the group.  One such person was Officer Gabe Gutierrez who had successfully developed a relationship with full member Daniel Cardenas.  Bates 778, 800.  The affiant made no mention of Cardenas as a potential resource nor any other recruited informer.  The

---

[5.] For example, although not disclosed in the original wiretap application, Officer Gabe Gutierrez, a fellow officer in the Ontario Police Department along with the affiant (Officer Lavoie), had a pre-existing relationship with Daniel Cardenas.  Whether deliberate or unwittingly, Cardenas provided Gutierrez with information from which law enforcement inferred the hierarchy and leadership structure of the Ontario Black Angels.  Bates 778 ¶ 68.a.

affidavit gave no hint that law enforcement made any attempt to take advantage of these resources.

Officer Lavoie summarily disregarded other potential witnesses as well. Law enforcement estimated to know of an additional "approximately 200 individuals in state or federal prison" affiliated with the Black Angels. Indictment, at 3. Officer Lavoie did not allude to these incarcerated members when seeking a wiretap. The affidavit makes no reference to the fact that *anyone* affiliated with the Ontario Black Angels might already be in custody of law enforcement. Having failed to disclose this information, Officer Lavoie made no attempt to justify failing to contact any of these individuals who might now be offered a tangible incentive to cooperate with law enforcement. By concealing the high number of individuals in penal custody, law enforcement was able to sweep under the rug several other investigative that would have been obvious.

Besides attempting to interview the inmates and seek their cooperation in exchange for benefits, law enforcement could have sought to collect recordings of jail calls placed by the affiliates of the group who were incarcerated.

Moreover, knowing they had a number of their targeted group already in custody, if they were reticent to contact the incarcerated group members directly, law enforcement could have sought to recruit the members' cellmates or others in the same row or module to provide information on the alleged Black Angels members themselves.

Indeed, if, as Officer Lavoie hypothesized, the Black Angels were extorting drug dealers in the local neighborhood, law enforcement probably could have learned more about the assumed practice by contacting people in the local neighborhoods who they believed were involved in drug dealing. If they had arrested anyone for drug dealing in the recent past, or who had charges pending, law enforcement would have had even more leverage to extract information.

Law enforcement did not have to make their investigation of the Black Angels overt. They had myriad ways of investigating by subterfuge. As noted above, Manuel Vega, the dead man who law enforcement had decided to wiretap from the beyond, had

recently been murdered.  The affiant noted that "his [Vega's] assailant was unknown, and the investigation is in progress."  Bates 044.  Law enforcement could have contacted persons affiliated with the Black Angels and find out more about the group under the pretext of investigating Vega's murder.

In fact, insofar as Vega was in fact killed in January 2009, a week *after* the perfunctory law enforcement drive-by of Navarro's home, conducting surveillance at Vega's funeral would seem an easy and obvious opportunity to identify the people who attended.  By telling the wiretap judge that the murder occurred a year earlier shielded law enforcement from having to justify why they did not use Vega's homicide as a cover for investigation or attend Vega's funeral.  Regardless of what the affiant's intentions were, law enforcement certainly knew of the timing and did nothing to avoid squandering the opportunity.

Officer Lavoie disavowed searches for two reasons.  First, he claimed ignorance of any place to search "that would accomplish the goals of the investigation."  Bates 086.  A case-dispositive search is not the standard.  It is rare that a single search or series of searches would ever accomplish all the goals of a wide-ranging investigation, just like a wiretap would not either.  Cf. *United States v. Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2001) ("Wiretaps themselves could little achieve [all] the investigative goals").  Law enforcement was aware of several locations where searches could have been performed.  Officer Lavoie stated in the opening section of the affidavit that he knew where David Navarro lived.  Bates 032.  Although not disclosed to the wiretap judge, law enforcement also knew what car Navarro drove.  Bates 1315-16, 4148-49.  This provided law enforcement not only with information to conduct surveillance, but also traffic stops or searches.  Law enforcement knew that Vega was killed right outside his house.  Bates 032, 044.  If they were genuinely interested in learning more about Vega's pre-death activities and the group he was associated with, law enforcement would have piggy-backed on the homicide investigation to search Vega's house as well.

His second reason for disavowing searches was a general desire to maintain the

secrecy of the investigation. Bates 087. The nature of the investigation could have been easily obscured by conducting simple parole searches, which required no warrant and no explanation of the purpose of the investigation. Had they bothered to look, they would have quickly learned that Carlos Vasquez, Jose Hurtado, Carlos Rivera, and others were on active parole and subject to parole search conditions. Bates 1227-30, 1344, 4060-63, 5332-35 (Carlos Vasquez); 5429-32, 5434-36 (Jose Hurtado); 1273-75, 1390-93, 3371-92, 3393-95 (Carlos Rivera); 4363-69 (Armando Barajas). Even their supposed primary target David Navarro could have been subjected to a parole search without law enforcement having to explain or justify themselves.[6]

Law enforcement did not even resort to the preliminary step of seeking a pen register or trap and trace device on Navarro's phone. Although employing a pen register and trap and trace on Alex's phone for two weeks, Bates 052, Officer Lavoie provided the wiretap judge with no basis for suspecting that Alex and Navarro ever communicated over Alex's phone. Bates 052-53.[7]

Rather than interviewing members or non-members (including members whose status as recruited informers was concealed from the court), conducting surveillance at Vega's funeral, contacting witnesses under the pretense of investigating Vega's death, conducting parole searches, pulling property and utility records, obtaining a mail cover on Navarro's residence, monitoring jail calls of incarcerated members, law enforcement disclosed only a single pass by Navarro's residence a month before seeking the wiretap (and concealed from the wiretap judge a second, more fruitful, pass). The Ninth Circuit has "rejected the notion that a single incident of failed physical surveillance could

---

[6.] Defendants suspect that law enforcement knew of many other individuals who were on active parole or subject to probation search conditions but the government has not provided discovery that would either confirm or negate this.

[7.] Law enforcement had a pen register and trap and trace on the other target telephone. There was no suggestion that Navarro (or the Ontario Black Angels more generally) had any contact with or connection to the primary user of the second target telephone. The affiant did not suggest that the pen register or trap and trace data revealed any connection to Navarro or the Black Angels.

establish that any subsequent surveillance could be ruled out as likely to be unsuccessful or too dangerous to pursue."  *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1113 (9th Cir. 2005), citing *Blackmon*, 273 F.3d at 1209.

The affiant offered virtually no explanation as to why law enforcement needed to, in essence, start their investigation of the Black Angles by deploying a wiretap against Navarro and a dead person.

As in *Carneiro*, the government "failed to conduct an investigation of [Navarro] prior to applying for authority to tap his telephone.  Instead, it appears that the DEA sought the wiretap simply because [Navarro] was believed to be a member of the conspiracy under investigation.  A suspicion that a person is a member of a conspiracy, however, is not a sufficient reason to obtain a wiretap."  *Carneiro*, 861 F.2d at 1181.

B.     The Investigation of Alex:

Law enforcement wholly failed to attempt reasonably available traditional means of investigation before wiretapping "Alex."

Although acknowledging that Steven Hoyos "has provided information to law enforcement in the past regarding Alex's narcotics trafficking," Bates 82, Officer Lavoie understated to the point of misrepresentation Hoyos's potential usefulness.  Officer Lavoie told the wiretap judge merely that, on one isolate occasion, Hoyos contacted San Bernardino County Sheriff Deputy Bannes[8] and informed him about a single transaction involving heroin.  Bates 039.

This history of Hoyos's service and his potential usefulness as an informer were disguised by the affiant's selective disclosure of facts.  Hoyos was actually on parole. Bates 039.  Based on Hoyos's parole status, Deputy Bannes conducted a search of Hoyos's apartment and, when he found $325 in cash and some handwritten notes he suspected were pay/owe sheets, Hoyos flipped and agreed to serve as an informer against

_____

[8]. The San Bernardino County Sheriff's Department was a member of the joint task force pursuing these wiretaps.  Bates 022.

11

Alex.  Bates 5523.

Officer Lavoie told the wiretap judge that, when another task force officer learned of Hoyos's successful recruitment as a potential informer, he "advised [Deputy Bannes] of the ongoing investigation."  Bates 039 n.8.  In fact, the task force officer did not merely "advise" Deputy Bannes of the investigation, the affiant knew that, rather than exploit Hoyos's willingness to assist, the task force officer affirmatively *asked Deputy Bannes "to cease further enforcement action*."  Bates 5523.

Law enforcement had every reason to anticipate that Hoyos would be a useful source of information against Alex.  Law enforcement knew that, at least three months before they applied for a wiretap, Hoyos "has since quit" working for Alex, Bates 5589, 5745, after the two had a spat over collections, Bates 5600-01.  Based on the information known to him at the time, Officer Lavoie opined that Hoyos had "decided not to sell narcotics for [Alex] any longer."  Bates 5601.  See also Bates 5601-02 (Hoyos "was not going to sell narcotics . . . anymore.")  Not only had Hoyos decided to separate from Alex, but Officer Lavoie opined that he did so while angry and upset at Alex.

Optimism that Hoyos would have cooperated would have been well-founded.[9] The day after he spoke with Deputy Bannes, Hoyos called back and told Deputy Bannes of his most recent transaction with Alex.  *E.g.*, Bates 039, 082, 5523, 5673.  Rather than continue to make use of this serendipitous opportunity, however, the task force unit told Deputy Bannes to abandon further contact with Hoyos and refused to make use of Hoyos themselves.  Although he knew about the episode – having previously disclosed it to the state wiretap judge – the affiant concealed from the federal wiretap judge that, at the time Deputy Bannes was conducting the parole search of Hoyos, Officer Martinez "coincidentally drove through the neighborhood and noticed the police vehicle near Hoyos' residence," and "spoke with Deputy Bannes and advised him of the ongoing investigation," and convinced Bannes to "agree[] to cease further enforcement action."

---

[9.] Officer Lavoie's claimed fear that Hoyos would spill the beans was hardly genuine.  Cf. Bates 5600-03.  Not only was Hoyos manifestly hostile towards Alex when he quit, but he had

Bates 5673.

Under the circumstances, there is no reason to doubt that Hoyos would have been unwilling to place monitored calls to Alex.

Exploiting Hoyos's cooperativeness was not the only traditional investigation law enforcement forewent.  Officer Lavoie claimed to want to intercept calls placed by Larry Cuevas and Sara Misquez yet acknowledged that both were in custody.  If law enforcement genuinely believed Cuevas and Misquez would be actively engaged in communicating with people on the outside, they could have searched jail telephone database not merely for calls to Alex, but calls to Hoyos, Onsurez, Macias, Perez, and others they supposedly believed worked with Alex.

Officer Lavoie claimed that part of the law enforcement's objective was to target not just Alex, but also his source of supply.  One person believed to be a supplier to Alex was an individual referred to as "Chipo."  Bates 033.  Approximately three months before Officer Lavoie applied for the February 2009 wiretap, at the direction of task force officers investigating this case, law enforcement directed a traffic stop of "Chipo," at which time he produced a driver's license "that identified himself as Kevin Alexander Gonzalez Martinez, with a [date of birth] of 12/11/85."  Bates 047.  Chipo/Martinez agreed to a consensual search of his car, which resulted in the discovery of 332 grams of heroin "in 17 individually wrapped packages, and approximately $6,000 in U.S. currency."  Bates 047.

After Chipo/Martinez was Mirandized, he "said that he understood his rights, *and that he wanted to answer questions*."  Bates 047.  Rather than concoct an unbelievable story, Chipo/Martinez told the officers "that he got the money that he had in his possession from selling drugs and that the narcotics were in his car because he was going to sell cocaine and heroin."  Bates 047.

Rather than seek Chipo/Martinez's further cooperation, or arrest him, law enforcement amazingly "released the individual that identified himself as Martinez per

already provided information about Alex without revealing the investigation.

1   PC 839(b)."  Bates 047.[10]  Although law enforcement had, with this minimal effort, not

2   only created an iron-clad case against Chipo/Martinez,[11] but also elicited

3   Chipo/Martinez's voluntary willingness to cooperate with law enforcement, the task force

4   officers made no attempt to exploit their access to this individual who, they suspected,

5   was Alex's supplier.  Although Chipo/Martinez expressed a willingness to cooperate

6   fully with police, they did not ask him to provide information about Alex or anyone else

7   he sold to and did not seek his cooperation in conducting consensually monitored calls

8   with Alex or other drug dealers Chipo/Martinez dealt with.[12]

9           Officer Lavoie also hypothesized that law enforcement had identified another

10  individual they suspected might be a source of drugs used by Alex.  On several occasions

11  after meeting with Alex, law enforcement followed the individual to Carlos and Saul's

12  Appliances in San Bernardino.  Bates 041-43, 073.  On one occasion in December 2008

13  and once again in January 2009, law enforcement observed the individual stop by a

14  residence on 10th Street in Ontario.  Bates 042, 073.  Law enforcement prepared reports

15  about their observations, determined the registered owners of the car used by the

16  individual and a car parked in the driveway but then made no effort to follow up such as

17  by conducting surveillance at Carlos and Saul's or  at the 10th Street residence.  Law

18  enforcement made no effort to determine whether the registered owners of the cars were

19  also associated with the house or Carlos and Saul's.  Law enforcement made no effort to

---

[10.] There is no section 839(b) in the California Penal Code.  Penal Code § 849(b) does provide authority for law enforcement to release an individual arrested either when the person was arrested only "for intoxication" or "being under the influence of a controlled substance" or where the officer "is satisfied that there are insufficient grounds for making a criminal complaint against the person."  Cal. Pen. Code § 849(b).

[11.] Chipo/Martinez was suspected of being a drug supplier.  He was detained pursuant to a lawful traffic stop.  He was consented to a search of his car which disclosed a large amount of drugs and large sum of  money.  He was informed of and voluntarily waived his Miranda rights. During an entirely voluntary conversation with police, he admitted knowingly possessing the drugs, the money, stating that the money came from drug dealing and that he was planning on selling the drugs he had.

[12.] It should be noted that the description is taken from the affidavit of Officer Lavoie in support of the wiretaps.  The government has refused to disclose the arrest reports or other

14

conduct a trash search at either location.  Law enforcement did not even discount the relevance or importance of these relatively obvious investigative steps.

Officer Lavoie categorically rejected the possibility of a trash search at Alex's residence.  He hypothesized that a trash search at Alex's "would pose a high risk of law enforcement detection due to its location in a somewhat rural cul-de-sac without any neighbors for a large distance."  Bates 089.  In truth, Officer Lavoie either did not know about Alex's residence or he was deliberately misleading the wiretap court.  Alex's residence was *not* on a street with a cul-de-sac.  Decl. Mackey ¶ 3.  No reasonable person would have honestly characterized it as a cul-de-sac.  Furthermore, the explanation on its face is fallacious.  The fact that Alex's residence was in a "somewhat rural [area] . . . without any neighbors for a large distance" would actually *decrease* the chances that law enforcement would be detected performing a trash search.  Decl. Mackey ¶ 5.[13] Moreover, the rationalization is belied by the fact that law enforcement *repeatedly* set up surveillance units outside Alex's house for hours at a time during ordinary daylight hours.[14]

---

materials relating to their interaction with Chipo/Martinez.

[13] No reasonably trained officer would perform the trash search on-site but would, instead, transfer the trash to another receptacle nearby and then return the owner's barrel to its original location.  This can be accomplished, quickly, easily, and quietly.  Being in a rural neighborhood would be beneficial because it would further reduce the likelihood that actions would be noticed. It is often accomplished in very late-night or extremely early morning hours so as to further reduce the likelihood that people will be circulating.

[14] Surveillance right outside Alex's house was performed:
• on November 19, 2008, where law enforcement staked out Alex's residence at 5 p.m. in the afternoon, observed an individual arrive at Alex's residence by car and then followed the car away, Bates 045, 1303, 4136;
• on December 8, 2008, where law enforcement staked out Alex's residence at 1:20 p.m. in the afternoon, and waited for over an hour to await one individual to arrive, watch the arrival, wait for their departure, Bates 042, 1116-18,
• on December 22, 2008, where law enforcement staked out Alex's residence in the late morning, observed a car arrive at around 11 a.m., and surveillance units remained at Alex's house for another half-hour, Bates 073-74, 1119-20, and
• on January 5, 2009, where law enforcement was staked out at Alex's home by 9 a.m. and remained there for over an hour and remained there for some unspecified time thereafter (the timing is not clear because the reports have not been produced but it is clear that surveillance

Officer Lavoie's purported fears about jeopardizing the investigation is a bare conclusion unsupported by any facts.  It is also inconsistent with the fact that law enforcement sought, obtained (and then casually abandoned) the voluntary cooperation at different points of the investigation of Hoyos, Misquez, Chipo/Martinez and others.

If law enforcement was genuinely concerned in determining Alex'x true identity (after suspecting that he was not Marco Antonio Torres-Cruz as identified on his driver's license and, in fact, as eventually charged in this case) law enforcement could have requested a mail cover for his home address, through which law enforcement could determine not only the likely names of occupants, but also the names of their financial institutions.  39 C.F.R. § 233.3 et seq.[15]

### C.   Neither Wiretap was Necessary

Under the heading "Interviews of Witnesses and Confidential Sources, Grand Jury Subpoenas, Grants of Immunity, and Financial Investigation," Bates 081, Officer Lavoie did not merely unreasonably reject every potential witness who could be questioned (and mislead the wiretap court about some of them).  Instead, there is no discussion whatsoever of subpoenas, grants of immunity, or any financial investigation.  Bates 085.

When addressing the availability of infiltrating either organization with undercover agents, Officer Lavoie closed his eyes to the voluntary cooperation of Hoyos and Chipo/Martinez and simply said "there is no CS that could facilitate . . . an introduction."  Bates 085.  Devoid of any specific facts regarding the two groups he was targeting – the Ontario Black Angels and Alex – Officer Lavoie stated only that, as a general matter, drug dealers "are often tight knit and do not often divulge information to

---

remained at Alex's home for over an hour), Bates 043, 1122-27.

After a four month gap, surveillance resumed at Alex's home and was performed on May 7, June 23, and June 24, 2009.  Bates 459-60, 1342-43, 4048, although the latter two were never disclosed to the wiretap judge even though law enforcement was still seeking wiretapping authority and still claiming that they could not perform a trash search at Alex's home.

[15.] At a later point in the investigation, law enforcement did come to believe that Alex and his wife had at least one bank account, Bates 337 n.21, but they still did not apply for a mail cover.

outside members." Bates 086. "These boilerplate assertions are unsupported by specific facts relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations. This is simply not enough." *Blackmon*, 273 F.3d at 1210.[16] Even the Department of Justice recognizes that "Conclusory generalizations about the difficulties of using a particular investigative technique will not suffice. It is not enough, for example, to state that the use of undercover agents is always difficult in organized crime cases because crime families, in general, deal only with trusted associates." U.S. Attorney's Manual, tit. 9, Criminal Resource Manual § 29 ¶ D.

Rather than rely on plain old-fashioned surveillance, Officer Lavoie argued that a wiretap was necessary because "physical surveillance typically cannot be done effectively and efficiently unless the agents know the time and place of an activity" and, thus, "physical surveillance used in conjunction with wire interception will more likely reveal the time and location of these activities, the identities of the participants, and the purpose of the meetings." Bates 080.[17]

Rather than conduct searches – whether pursuant to warrant or a lawful exception to the warrant requirement – Officer Lavoie argued that, "because members of the conspiracy often talk to each other about the contraband they have," searches should be deferred until after wiretaps are employed because "use of information received by way

---

[16.] In demonstrating the necessity of a wiretap to an issuing judge:
> It is most important that this section be *tailored to the facts of the specific case* and be more than a recitation of "boiler plate." The affidavit *must discuss the particular problems* involved in the investigation in order to fulfill the requirement of 18 U.S.C. § 2518(1)(c). The affidavit should explain specifically why other normally utilized investigative techniques, such as physical surveillance or the use of informants and undercover agents, are inadequate *in the particular case*.

U.S. Attorney's Manual, tit. 9, Criminal Resource Manual § 29, ¶ D (emphasis added).

[17.] This is an especially curious representation given that, in the ensuing month of wiretapping, there was evidence of only two instances of surveillance in conjunction with the wiretap and, in fact, neither episode actually required resort to a wiretap. On February 19 and 24, law enforcement placed pretext calls to Navarro and Alex while another officer confirmed, by reference to a pen register, that law enforcement had the right number for their respective target. Bates 1133-34, 1317-18, 3963-64, 4150-51.

of wire interception has been successful in disclosing multiple stash locations" and, even if not disclosing locations, "provides substantial assistance in determining when to execute a search warrant."  Bates 087.

The defect in this reasoning is that it flies in the face of Congressional directive. Congress enacted a "necessity" standard, not a more "effectively and efficiently" standard.  Wiretaps, the Supreme Court emphasized, "were not to be routinely employed as the initial step in criminal investigation.  Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  *Giordano*, 416 U.S. at 515, *citing* 18 U.S.C. § 2518(1)(c), 2518(3)(c).  Congress stated clearly what it anticipated "normal investigative procedures" would consist of:

> Normal investigative procedures would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

S. Rep. 1097, 90th Cong., 2d Sess., at 101, *reprinted in* 1968 U.S. Code Cong. & Admin. News 2153.

In short, the affidavit rejected out of hand several of the techniques that Congress expected would be regularly attempted before seeking a wiretap.

## III.     Law Enforcement Failed to Demonstrate Necessity for the First Extension 09-38(A) Wiretap in March 2009

### A.     The Black Angels Investigation

On the same day the February 13, 2009 wiretap was sought to wiretap David Navarro, Officer Lavoie sought and obtained authorization to place a pen register and trap and trace device on a telephone suspected to be used by David Navarro.  Bates 206. On February 19, 2009, law enforcement confirmed the existence of data reflecting an

1  outgoing call on the suspected telephone number while simultaneously observing
2  Navarro talking on his phone.  Bates 206.  Based on telephone usage, Officer Lavoie
3  determined that Navarro appeared to be in regular contact with Juan Diaz, Bates 182-83,
4  another "known and admitted member of the Black Angels."  Bates 154.  On March 16,
5  2009, Diaz was arrested for suspected involvement in an unidentified homicide case and
6  then released.  Bates 302.  The following day, law enforcement returned to court to seek
7  an extension of the wiretap on Navarro and to add Diaz to the list of targeted subjects.
8  Bates 117.

9       Once again, the affiant summarily dismissed the possible use of informers while
10 concealing the fact that law enforcement had already successfully recruited informers
11 from within the Black Angels.  Bates 778, 800.

13   **B.    The Investigation of Alex**
14       The February 13, 2009 wiretap terminated on February 19, 2009.  Bates 112.  By
15 undisclosed means, Officer Lavoie obtained telephone traffic data on Hoyos's phone[18]
16 and opined that he had identified a new phone number being used by Alex.  Bates 174.
17 The following day, law enforcement obtained authorization for a pen register and trap
18 and trace devices on the phone suspected to be used by Alex.  Bates 174-75.  A few days
19 later, February 24, 2009, one of the law enforcement officers executing the prior wiretap
20 placed a pretext call to Alex on the new telephone number and reported recognizing the
21 voice on the other end as Alex's.  While the pretext call was being placed, another law
22 enforcement officer observed Alex answer the phone.  Bates 175.
23   **C.    Argument**
24       "Extension orders do not stand on the same footing as original authorizations but
25 are provided for separately."  *United States v. Giordano*, 416 U.S. 505, 530 (U.S. 1974)

27 [18.] The discovery does not disclose that a pen register or trap and trace device on Hoyos's
28 phone was ever applied for or authorized by a court of law.  Officer Lavoie reports simply that
he "completed a toll analysis of the tolls" on Hoyos's telephone but sheds no light on how he
obtained that information.

"Extensions of [a wiretap] order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section."  18 U.S.C. § 2518(5).  In other words, "*Each* wiretap application, standing alone, must satisfy the necessity requirement." *Carneiro*, 861 F.2d at 1176 (emphasis original); see also *Gonzalez, Inc.*, 412 F.3d at 1115.  Moreover, "where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results."  18 U.S.C. § 2518(1)(f).

"[A]n issuing judge may not examine various wiretap applications together when deciding whether a new application meets the statutory necessity requirement.  *Gonzalez, Inc.*, 412 F.3d at 1115.  "[T]he government is not free to transfer a statutory showing of necessity from one application to another – even within the same investigation." *Gonzalez, Inc.*, 412 F.3d at 1115.  As with original wiretap orders, "there must be a showing of necessity with respect to each telephone and conspirator." *Carneiro*, 861 F.2d at 1182.

        1.    <u>The Initiation of Wiretapping on Juan Diaz and Extension of</u>
              <u>Wiretapping Navarro Was Not Supported by a Showing of Necessity</u>

Contrary to 18 U.S.C. § 2518(1)(f), there was *no information whatsoever* about the results obtained from the wiretap during the original interception period.  "Plainly the function of § 2518(1)(f) is to permit the court realistically to appraise the probability that relevant conversations will be overheard in the future.  If during the initial period, no communications of the kind that had been anticipated had been overheard, the Act requires an adequate explanation for the failure before the necessary findings can be made as a predicate to an extension order." *Giordano*, 416 U.S. at 532.  For all that the wiretap judge knew, during all the time the wiretap was up, government officials intercepted hundreds of calls although not a single one of them was relevant to the investigation.  For all the wiretap judge knew, law enforcement simply intended to

continue intercepting hundreds of innocent, interfamilial communications in the hopes that they might overhear something that they could interpret or characterize as sinister or suspicious.  Where information about the interceptions during the prior interception period "[have] been omitted no extension order at all could have been granted."  *Id.*

With Vega's death now two full months in the past, Officer Lavoie admitted that Vega had died in January 2009 rather than January 2008.  At the time of the February 2009 wiretap, law enforcement might have been concerned that informing the judge of Vega's very recent demise might have caused the judge to suggest using the investigation of that homicide as a pretext for further investigation.  With the death now two full months behind, they could be candid with the court and have little risk that disclosure of the homicide would be used against them in their showing of necessity.

In the five weeks since obtaining the February 13, 2009 wiretap, law enforcement still did *nothing* by means of traditional investigative methods to further its knowledge of whether Navarro was engaging in unlawful behavior.  Indeed, unlike the February 13, 2009 wiretap, law enforcement did not even bother with the pretense of single feckless drive-by of Navarro's home.  By this time, law enforcement was confident that they knew the make, model, license number, and color of Navarro's car.  Bates 206.  But the only effort they made towards investigating him was to confirm Navarro's phone number.  Bates 206.  The use of a pen register is not a "traditional investigative technique" that will satisfy the necessity requirement.  "The use of pen registers alone is insufficient to establish necessity for a wiretap."  *Gonzalez, Inc.*, 412 F.3d at 1113.

Law enforcement made no attempt to contact any of the members of the group they had successfully recruited as potential informers.  Law enforcement made no attempt to contact any of the approximately 200 inmates in state or federal custody who they believed were affiliated with the Black Angels.  Law enforcement made no attempt to contact the cellmates or other inmates incarcerated along with the Black Angels members who were in custody.  Law enforcement did not contact any of the 250 individuals who were affiliated with the Black Angels and not currently in custody.  Law

1   enforcement made no attempt to obtain the recorded telephone conversations of those
2   Black Angels affiliates who were incarcerated in local custodial facilities.

3       Law enforcement did not attempt to monitor the calls coming from members being
4   detained in state or federal jails or prisons.

5       Law enforcement did not seek to determine who, among the members of the Black
6   Angels, was on probation or parole and subject to a search condition.  Although law
7   enforcement knew that several individuals affiliated with the Black Angels were on
8   parole, they made no effort to conduct searches pursuant to that authority.

9       Law enforcement did not attempt to contact any of the assumed victims of the
10  suspected extortion by the now-deceased Vega.  Law enforcement did not take the
11  opportunity to detain Diaz and question him once he was already in custody for a
12  suspected homicide.  Law enforcement conducted no traffic stops of Navarro or search
13  his home or car.

14      Indeed, despite earlier representations that surveillance and searches would be
15  much more effective if wiretapping were allowed, Bates 087, once granted wiretapping,
16  law enforcement made no effort to conduct any surveillance or searches.

17      Officer Lavoie did not "reasonably explain why traditional investigative tools are
18  unlikely to succeed in a particular investigation, but [instead just offered] 'boilerplate
19  conclusions that merely describe inherent limitations of normal investigative procedures,'
20  which we have found insufficient to establish necessity." *Gonzalez, Inc.*, 412 F.3d at
21  1114, quoting *Blackmon*, 273 F.3d at 1210.

22      They only obtained a pen register on Navarro's phone, confirmed he was using the
23  phone at the time a phone call came in to his phone, and then applied for the wiretap on
24  March 17, 2009.  "The use of pen registers alone is insufficient to establish necessity for
25  a wiretap." *Gonzalez, Inc.*, 412 F.3d at 1113, citing *Carneiro*, 861 F.2d at 1183 n.16.
26  And that is all the government did to justify its wiretap on Navarro.

27
28

22

2.     <u>The Continued Wiretapping on Alex and Persons Related to Him
Was not Supported by a Showing of Necessity</u>

The government did no more in furtherance of its wiretap of Alex's phone.

As with its investigation of Navarro and the Black Angels, Officer Lavoie did no more than offer "'boilerplate conclusions that merely describe inherent limitations of normal investigative procedures.'" *Gonzalez, Inc.*, 412 F.3d at 1114, quoting *Blackmon*, 273 F.3d at 1210.

The government did not revisit its decision to refuse the assistance that Hoyos so eagerly offered and was able to provide.  Law enforcement did not seek to exploit the ability to conduct searches on others associated with Alex who they knew were on parole. Although Misquez and Cuevas remained in custody, law enforcement made no effort to monitor their jail calls or interview them about Alex, Hoyos, and others.  Law enforcement did not seek to contact Chipo/Martinez who readily admitted to dealing in drugs and who law enforcement believed was supplying drugs to Alex; they did not ask if he would place monitored calls for them; they did not charge him with an offense and seek to recruit his cooperation; they did not even seek to remain in contact with him.

Law enforcement did not attempt to conduct any new surveillance at all, merely reciting that it had conducted some surveillance of Alex, Misquez and Hoys many months earlier.  Bates 189-201.  No contact with the suspected source known to be affiliated with Carlos and Saul's Appliances in San Bernardino.

Law enforcement did nothing other than confirm that they had the right phone number for Alex.

"A wiretap cannot be the initial step in a criminal investigation." *Carneiro*, 861 F.2d at 1181, citing *Giordano*, 416 U.S. at 515, and *Brone*, 792 F.2d at 1506.  "Before using a wiretap, the agents must, at the very least, use traditional investigative methods that 'easily suggest themselves and are potentially productive and not unduly dangerous.'" *Carneiro*, 861 F.2d at 1181, quoting *Ippolito*, 774 F.2d at 1486.  Here, it appears law enforcement relied on a wiretap as their first step and, by performing no

further investigation during the first wiretap period, as their first step a second time.

## IV.   Law Enforcement Failed to Demonstrate Necessity for the Second Extension 09-38(B) Wiretap in May 2009

### A.   The Black Angels Investigation

Law enforcement took down the March 17, 2009 wiretap on Navarro's phone on April 1, 2009 because "the level of wire communications . . . that were pertinent to this investigation was low."  Bates 258.

Law enforcement did no more surveillance of Navarro.  They did nothing more to contact potential witnesses who might provide information about Navarro or the Black Angels generally.  They made no attempt to contact the reputed victims of the actions law enforcement suspected to be criminal.

Without doing any more traditional investigation than they had preceding the prior two wiretaps, law enforcement again applied for a wiretap on a new phone believed to have been used by Mr. Navarro.  Bates 265.[19]

The affiant knew, but did not disclose, that fellow Black Angels member Daniel Reyes had been arrested on a federal indictment and his house searched pursuant to a search warrant on April 21, 2009.  Bates 579, 3505-07.  Having failed to reveal that this additional Black Angels member was incarcerated, the affiant did not attempt to explain why it would not be helpful for law enforcement to monitor Reyes' jail calls as a way of finding out more information about the group's membership and their activities.

The affiant, once again, concealed Cardenas's status as a member of the Black Angels who law enforcement had successfully recruited as an informer.  Bates 778, 800.

The only avenues of investigation that Lavoie hypothesized and then discounted related to the investigation of Alex.

---

[19.] How law enforcement determined that the phone was one used by Navarro is a mystery. The phone was not registered to Navarro or another person at his residence.  There is no record

24

B.    The Alex Investigation

Several developments occurred in the investigation of Alex between the 09-38(A) and 09-38(B) wiretaps.

On March 20, 2009, responding to a complaint about narcotics activity, law enforcement observed and then detained Richard Castorena.  Castorena, under the name "Richard LNU," had been a target subject on the Alex portion of the wiretap investigation since it was first initiated.  Bates 34, 153.  Officer Lavoie told the wiretap judge that Castorena was the Richard LNU they had been targeting.  Bates 300.

Officer Lavoie did not, however, tell the wiretap judge how they found out Castorena's name.  More specifically, Officer Lavoie did not tell the wiretap judge that, over six weeks before he was applying for the May 1, 2009 wiretap, law enforcement had stopped and detained Castorena.  More importantly, Officer Lavoie did not tell the wiretap judge that Castorena was found to have several outstanding warrants, that he was arrested based on them, that during a search incident to arrest Castorena was found to be in possession of numerous small packages of cocaine and heroin, and that field tests confirmed their narcotic properties.  Bates 1137.

Given the circumstances that followed, Officer Lavoie was understandably reticent to disclose this information to the wiretap court.  Law enforcement did not, as one might have assumed, exploit the opportunity provided by Castorena's arrest.  Law enforcement did not question Castorena about where the drugs came from.  They did not ask him why he was in possession of them.  They did not ask him what he was planning to do with the drugs.  Law enforcement did not broach the subject of Castorena serving as an informer; they did not propose to offer him any leniency in exchange for cooperation; they did not inquire into his willingness to place monitored calls.  They did not ask if he would introduce an undercover agent to infiltrate the group as a person looking for "work."  It's not clear they asked him anything at all.

Instead, Castorena was booked on the outstanding warrants . . . and then released.

---

or allegation that law enforcement obtained a pen register or trap and trace device for the phone.

It does not appear that Castorena was even charged for his incontestable crime of drug possession.

Law enforcement displayed a similarly cavalier attitude towards another opportunity that landed in their lap. As noted previously, when Hoyos was subjected to a parole search, he promptly agreed to serve as an informer and provide information to law enforcement about his dealings with Alex. Bates 5673. The investigators on this case, however, refused to accept his cooperation and refused to continue communicating with him even after he contacted them with more information. Bates 5673. On March 21, 2009, Hoyos was stopped at the U.S.-Mexico border with a load of 31 kg (68 lbs) of marijuana. Bates 1145. Hoyos "was taken into custody without incident," "waived his Miranda rights, and Hoyos agreed to make a statement." Bates 1145. Although Hoyos denied knowledge of the drugs in his car, law enforcement made no attempt to recontact Hoyos after he had spent a few more days in lockup. Once again, rather than attempt to exploit this favorable development in the investigation, law enforcement abandoned any attempts to recruit Hoyos.

Hoyos, law enforcement knew, had a long-standing grudge against Alex. They also knew that he had been snubbed by Alex earlier in the day before he traveled down to Mexico to import marijuana. Experienced law enforcement officers were surely aware of the amenability of certain individuals facing criminal charges to soften earlier refusals to cooperate. Here, however, not only did Officer Lavoie "request that charges not be filed" – a fact he concealed from the wiretap judge – but, upon learning that the state district attorney had filed charges against Hoyos ensured that "arrangements are being made between the AUSA and the District Attorney to have the charges dismissed," Bates 1145-46, another fact he also concealed from the wiretap judge.

The same lackadaisical approach manifested itself after capturing an individual believed to be one of Alex's suppliers. On March 31, 2009, Gilberto and Jose Gutierrez met with Alex at around 11 a.m. After leaving Alex's, the Gutierrezes were followed as they traveled to and entered an apartment approximately 30 miles away from Alex's.

Bates 3204.  Following the apartment stay after leaving Alex's, the Gutierrezes stopped at a second location for about an hour.  Bates 3204.  At 2 p.m., approximately 2½ hours after they left Alex, the Gutierrezes were targeted for a traffic stop.  Bates 303, 317-18.  The Gutierrezes consented to a search of their vehicle which revealed nearly $12,000 in cash.  Bates 303, 317, 3205.

Police released Gilberto Gutierrez for lack of evidence and booked Jose Gutierrez into ICE custody as a suspected previously-deported felon.  Bates 317-18, 3205.  They did not question the Gutierrezes further about suspected narcotics trafficking.  Although claiming they did not want the Gutierrezes to be tipped off to the pending investigation, they seized the nearly $12,000 cash, advising the Gutierrezes that it was suspected to be the proceeds of illegal activity.

The affiant disclosed that Orosco and Felix had both been subjected to traffic stops and consensual searches and that the search of Felix uncovered a drug supply, but failed to take advantage of the fruits of these efforts and released them.  Bates 319-21, 336-37.  Law enforcement had similarly obtained access to two different informers, one of whom was in a position to broker controlled purchases from Ray Perez.  Bates 333, 336.  Rather than attempt to exploit these resources, the affiant summarily dismissed them.  Although opining (without interviewing the informer) that the informer did not have immediate access to persons above Perez, the affiant never considered the possibility of brokering increasingly larger transactions that would enable him to work up the supply chain.

Although acknowledging a single instance of surveillance at one of Alex's suspected suppliers, law enforcement failed to inform the wiretap judge that they had observed numerous other individuals in the area who might have been able to serve as potential informers.  Bates 1159-62, 1323-25, 3189-91, 4156-58.

The affiant opined that Jose LNU (Silva) "is communicating with Navarro regarding extortion payments Jose LNU [Silva] is paying to Navarro."  Bates 328.  Apart from the fact that Congress did not authorize wiretapping on *the victims* of crimes, even though law enforcement was aware of the phone number that Jose/Silva was using, the

affidavit reveals no efforts geared at attempting to identify Silva or investigate his exploitation by means other than targeting him in the wiretap.

**V.      Law Enforcement Failed to Demonstrate Necessity for the Third Extension 09-38(C) Wiretap on June 17, 2009**

      A.      <u>The Black Angels Investigation</u>

In the six weeks since law enforcement obtained the wiretap 09-38(B) on May 1, 2009, the affiant told the wiretap judge that they had twice conducted surveillance on Navarro, once on May 15, 2009 while he was accompanying Salvador Martinez around his neighborhood, Bates 448-50, and a second time on May 21, 2009 when he was meeting with Teresa Castro, Bates 462.

Although all the prior wiretap orders had included an order authorizing the disclosure of GPS tracking of all the subjects, the officers provided the wiretap judge with no information about their GPS tracking of Navarro.  Law enforcement concealed extensive surveillance of Navarro on May 29, 2009, revealing the identity of several other people he was interacting with. Bates 3141-42.  Law enforcement also concealed surveillance of Navarro and Rivera on May 26, 2009.  Bates 595.

Juan Diaz had been "arrested and the[n] released for his suspected involvement in a homicide."  Bates 302, 423.  The affiant gave no further details about the crime or why Diaz had been a suspect and arrested for that crime.  The affiant gave no explanation why Diaz had been released after arrest.  The affiant gave no explanation why law enforcement would not or could not use Diaz's suspected involvement in the homicide as a pretense for contacting Diaz and others for more general information about the Black Angels.

The affiant concealed from the wiretap judge that Daniel Reyes had been the target of a search warrant, his house searched, and Reyes arrested.  Bates 579, 3505-07.  Having concealed the arrest, the affiant did not need to attempt to explain why law enforcement did not use the arrest as a pretext for obtaining further information about

Reyes and the alleged organization or why his calls could not be monitored as a means, short of a wiretap, for intercepting his telephone calls as a way of obtaining information about the membership and their activity.

The affiant concealed that law enforcement had conducted a traffic stop of Jose Hurtado, Francisco Lopez, and Carlos Vasquez, all of whom allegedly confirmed their affiliation with the Black Angels.  Bates 1183-91, 1333-35, 2202-04, 2205-2213, 3105-13, 3114-16, 4016-24, 4166-68.  Having concealed the detention, the affiant apparently felt no need to inform the wiretap judge that law enforcement released all three without any follow-up.

The affiant also concealed that Fernando Vasquez had been arrested for narcotics activity on May 19, 2009, a month before the wiretap, Bates 1523-31, and that law enforcement obtained his admissions regarding the drug activity but failed to take advantage of the opportunity to question him further about any other subjects.

The most significant concealment in the June 2009 wiretap, however, was probably the fact that Black Angels member Paul Rodriguez had been killed.  Having failed to disclose Rodriguez's death, the affiant similarly concealed that Black Angels member led police on a car chase that resulted in his arrest and, when searched, discovery of the gun allegedly used to kill Rodriguez.  Bates 573 ¶ 45.a.

The failure to acknowledge Rodriguez's death enabled the affiant to easily conceal the investigation into Rodriguez's death that would lead law enforcement to interview Marlon Jiron and his girlfriend and thereafter conclude that they were "considered to be cooperating witnesses" in the homicide investigation.  Bates 614.

This also enabled the affiant to ignore the opportunity to use Rodriguez's funeral as an opportunity for surveillance as well as the opportunity to use Rodriguez's homicide as a pretext for contacting other members of the Black Angels.

Officer Lavoie acknowledged learning about an informer who had information about Navarro's alleged extortion activities.  Bates 465-66.  Lavoie summarily decided to reject any use of the informer without even talking to the informer based on his

uninformed conclusion that "the informant does not have any further knowledge of the Ontario Black Angels . . . or the extortion activities." *Id.*

The officer for the first time included Juan Gil as a potential target subject. As explained in the concurrent motion challenging probable cause, law enforcement made no showing of probable cause to justify naming Gil as a target subject. The affiant noted, as to Gil, that "Gil is currently incarcerated in an unknown federal institution." Bates 427. Given that Officer Lavoie knew that the person he was interested was named Juan Gil, he could have at least confirmed that he had checked with BOP to learn Gil's whereabouts. As Judge Carr's leading treatise on wiretapping observes:

> [The] government should describe its attempts to discover the identities of all persons concerning whom it has probable cause to believe are participants in the criminal activity being investigated, and the involvement of known users of the telephone or facilities in the particular criminal enterprise. The application should recount the agents' efforts and their use of the various investigatory methods normally used to ascertain identity, such as informant's tips, physical surveillance, and toll or pen register records. The application should also explain the problems which have impeded discovery of the identities of persons likely to be participants in the crime and parties to the anticipated conversations.

1 Carr & Bellia, Law of Electronic Surveillance § 4:38 (2012) (footnote omitted).

The affiant identified no further efforts to investigate the Black Angels and Navarro's alleged extortion. There was no attempt to contact informers from within the group (whose status had been concealed from the wiretap judge). There was no attempt to monitor jail calls by targets who were in custody. There was no attempt conduct any other traffic stops. There was no attempt to conduct parole searches or searches under other administrative pretenses. There was no attempt to interview any witnesses, including suspected victims of Navarro's alleged extortion. There was not even an attempt to obtain a pen register. In short, with no further efforts, and more concealments

1  than actual affirmative investigation, the government sought to intercept communications
2  by Navarro, Barajas, Juan Diaz, Enrique Jimenez, Daniel Reyes, and Juan Gil.

4       B.    <u>The Investigation of Alex</u>

5       Having conducted surveillance of Orosco and Cabezon and then conducting a
6  traffic stop of Orosco, Bates 459-60, the affiant concealed that one of the occupants of
7  the car had been seen throwing narcotics packaging out of the window, thereby providing
8  a basis for arrest and questioning, Bates 1170-73, and also concealed that, through
9  questioning after the traffic stop, law enforcement learned about additional meetings
10 where potential drug transactions would take place but law enforcement skipped rather
11 than attempting surveillance or attempting to recruit either as an informer.  Bates 1170-
12 73.

13      Although conducting surveillance at Alex's residence and checking the
14 registration status of vehicles arriving at his house, law enforcement made no further
15 effort to identify or contact those people.  Bates 439.

16      Although confirming that Sosa and Cortez were the targets of a search warrant that
17 resulted in their arrest on drug charges, Bates 453, the affiant concealed from the wiretap
18 judge that the search warrant and arrest were enabled, in part, by information provided by
19 an informer, Bates 3274-78.   By concealing the informer's assistance, the affiant could
20 plausibly suggest to the wiretap judge that law enforcement knew of no individuals from
21 whom information could be provided.  The affiant also concealed from the wiretap judge
22 that he had squelched the filing of state charges against Castro and Sosa, Bates 3274-78,
23 avoiding any inquiry into whether prosecution of them might lead to their being recruited
24 as informers.  The affiant also concealed from the wiretap judge that law enforcement
25 had confirmed the make, model, color (and presumably license number) of Castro's car,
26 Bates 1183-91, thereby easing the effort needed to conduct surveillance on Castro.

27      Although telling the wiretap judge that law enforcement had access to an informer
28 who could contact Perez and broker a controlled purchase of drugs from Perez, the affiant

summarily dismissed any use of the informer on the assumption (without even attempting to interview the informer or handler on the matter) that he would not be able to provide any useful information.  Bates 465.  Although informing the wiretap judge that Perez had been arrested at his home, had been found in possession of drug trafficking materials that he acknowledged were his, Bates 440, 465, the affiant concealed that law enforcement had identified a second address for Perez where an additional search was executed, and that Perez's wife also waived *Miranda* and spoke to officers.  Bates 3299-3317.

With minimal additional efforts in furtherance of investigating Alex – surveillance of Alex and a suspected supplier and a trash search at a suspected supplier's home, Bates 459-60, 472 – law enforcement sought to retain every other individual as a wiretap target without any attempt to resume employment of traditional investigative methods before continuing the wiretap.

## VI.   Law Enforcement Failed to Demonstrate Necessity for the Fourth Extension 09-38(D) Wiretap in July 2009

### A.   The Black Angels Investigation

Between June and July 2009, law enforcement bungled the single biggest opportunity for surveillance to observe and identify as many Black Angels members as possible.  The funeral for Paul Rodriguez was held on June 23, 2009, nearly three weeks before the July 2009 wiretap, 09-38(D).  Bates 580.  Navarro was intercepted on the telephone telling Reyes to "tell the homies that whoever could go should go."  Bates 580.  Reyes confirmed that he would do so.  Bates 580.  For all that appears from the wiretap affidavits, law enforcement made no attempt to send even a single agent to conduct surveillance at the funeral.

Law enforcement made no effort to advance their investigation of Juan Diaz or Juan Gil by use of traditional means preceding the July 2009 wiretap.[20]

---

[20.] Law enforcement did learn that Gil was incarcerated at Hazleton U.S.P. but that probably did not require much effort at all.  They did nothing beyond attempting to determine that fact.

32

1    The only efforts relating to Virginia Gil was the decision to order a mail cover for

2  mail coming to her residence.  Bates 616.

3    Although identifying Ernest Castillo and Fernando Lopez as target subjects, the

4  only efforts towards investigating their involvement was a single instance where both

5  were observed to be present when law enforcement were conducting surveillance on

6  Navarro.  Bates 574.  Although Lopez was seen to have interacted with others and law

7  enforcement took down identifying information including car makes, models, colors, and

8  presumably license plates, law enforcement made no attempt to identify or contact any of

9  those individuals.  Bates 1358-63, 4191-96.  Although identifying Reyes as a target

10  subject, the only further investigation of him by traditional means was an isolated

11  instance of surveillance on July 8, 2009, nearly ten days before the next extension.  Bates

12  612.[21]  These single instances of surveillance as to each of these individuals failed to

13  demonstrate good faith efforts to investigate these individuals by means short of a

14  wiretap.  *Gonzalez, Inc.*, 412 F.3d at 1113; *Blackmon*, 273 F.3d at 1209.

15    Law enforcement conducted a parole search at Carlos Vasquez's residence, Bates

16  563, but did nothing more towards investigating him by traditional means.

17    Jimenez found himself the object of surveillance twice, on June 23 and July 3,

18  while he was in the presence of Navarro.  Bates 574, 608-11.  The affiant concealed that,

19  on both occasions, law enforcement obtained identifying information (including license

20  plate numbers) of people he interacted with and similarly concealed that law enforcement

21  made no effort to follow up and contact or identify any of those people.  Bates 608-11,

22  5309-16.  The only other investigative step was a traffic stop on June 25, where there was

23  no indication that officers attempted to ask him any questions, and then released.  Bates

24  608, 1231-38, 1349-57, 4182-90.

25    Jiron was deemed a "cooperating witness" on June 23, 2009, after his house was

26  

27  [21.] In fact, law enforcement concealed the fact that, on June 30, 2009, they applied for a pen
register on Reyes's phone.  Bates 960.  Had the affiant done so, the wiretap judge might
reasonably have questioned why law enforcement did not wait until the pen register had run its
course before seeking a wiretap.

28

searched and he fully cooperated with law enforcement in their investigation.  Bates 562, 614.  The affiant identified no attempts to law enforcement to take advantage of Jiron's cooperativeness but simply named him as a target for the wiretap.

Espinoza was made known to law enforcement only twice.  First, by reviewing Rivera's call records they learned that he and Espinoza had been in contact.  Bates 600-01.  Second, while in the company of Navarro, Espinoza was seen by law enforcement as Navarro was being targeted for surveillance at the time.  Bates 606-08.  Law enforcement observed Espinoza to have been in contact with numerous individuals.  Law enforcement identified the cars, by make, model, color and presumably license plate, of people who were in contact with Espinoza.  Bates 1358-60, 4191-93.  They did not, however, did not follow up to contact or even identify the people Espinoza had interacted with.  Bates 1231-38, 1349-57, 4182-90.

Rivera's phone records were checked and he was found to have been in contact with Jimenez and Espinoza.  Bates 600-01.  While in the presence of Navarro, Rivera was seen by law enforcement during their surveillance of Navarro.  Once again, law enforcement made no effort to follow up with any of the people Rivera had been in contact with.

Law enforcement reviewed call records for Barajas and followed Navarro on one occasion as he drove to a bar where Barajas was already present.  Bates 574, 585, 605-06.

The affiant concealed from the wiretap judge that, in the interim, law enforcement had applied for pen registers on Rodriguez's phone, Monica Cornejo's phone (Barajas's niece), and Reyes's phone.  Bates 960, 6488-96.

Although recognizing that the death of Rodriguez enabled law enforcement to contact many witnesses ostensibly under the pretext of investigating that death, Bates 562, no attempt was made to do so.

Law enforcement learned about an informer who was described as "not an active member of the Ontario Black Angels," raising suspicion that the person was in fact a former member of the group.  Bates 615.  The individual was confirmed to "remain in

social contact with the Ontario Black Angels members." Instead of seeking general information that would foster an investigation by traditional means, the only question posed to the informer was who was using which phone number. Rather than continue using the informer to obtain additional information and confirm the accuracy of their knowledge, the affiant minimized the relevance of this informer and suggested that this opportunity posed no obstacle to renewing the wiretap. Bates 615.

Cardenas's status as an informer within the group was still concealed from the wiretap judge. Bates 778, 800. No attempt was made to capitalize on his willingness to cooperate with law enforcement.

With no further efforts, the government sought a renewed wiretap targeting Barajas, Juan Diaz, S. Espinoza, Juan Gil, Virginia Gil, E. Jimenez, M. Jiron, F. Lopez, F. Morales, Navarro, D. Reyes, C. Rivera, and C. Vasquez.

### B.    The Investigation of Unexplained Targets

Law enforcement identified Boxer, El Oso, and Rude Boy as potential targets. Law enforcement never explained who these individuals were, why they should be targeted, or what steps law enforcement had taken to investigate them short of a wiretap.

### C.    The Investigation of Alex

The affiant alleged that law enforcement conducted a traffic stop of Octovio Pena. Bates 571. The government has produced no discovery to date that would corroborate this allegation. Unless the government can prove that the traffic stop occurred, the Court should deem it to be an untruth told to the wiretap judge as a means of obtaining a wiretap without conducting the requisite background investigation.

The affiant concealed from the wiretap judge that surveillance of Alex on June 24, 2009, led them to a potential informer who they made no attempt to identify or contact. Bates 1342-43, 3147-48, 4175-76. The affiant concealed that a state investigation led the wiretap team to another potential informer who was able to contact Alex. Bates 804, 953.

Although intercepting a phone call where the speakers discussed that "Chato" was "busted," Bates 582, law enforcement made no effort to identify anyone with the moniker "Chato" in the jail records or by reports of recent arrests in an attempt to interview the individual or recruit them as a potential informer.

The only efforts undertaken to investigate Jose LNU (Silva) was a review of his phone records.  Bates 591-92.

Notwithstanding the facts provided in connection with previous wiretap applications, law enforcement still made no attempt to exploit the probability that Hoyos would serve as a potential informer.  Nor did the affiant explain why a wiretap was needed on Hoyos since he had been arrested and held in custody for the past three months.

With no further explanation as to the need for a wiretap in lieu of returning to traditional means of investigation, law enforcement renewed its request to target "Alex" (Marco Antonio Torres-Cruz), Cabezon, Richard Castorena, Teresa Castro, Deborah Cortez, Larry Cuevas, Lucio Diaz, Rebecca Estrada, Victor Felix, Gilberto Gutierrez, Jose Gutierrez, Steven Hernandez,  Steve Hoyos, Carmela LNU, Jose LNU (Silva), Mario LNU, Gabriel Macias, Salvador Martinez, Kevin Martinez-Gonzalez (a.k.a. Chipo), Sara Misquez, Paul Onsurez, Patrick Orosco, Octavio Pena, Ray Perez, "Red Eye," Roberto Sosa, Armando Venegas, and Shawn Young.

## VII.   Law Enforcement Failed to Demonstrate Necessity for the Fifth Extension 09-38(E) Wiretap in August 2009

### A.   The Black Angels

The affiant identified Adolph Moraga as a new potential target.  Bates 751.  The affiant requested continued electronic surveillance on Castillo, Diaz, Espinoza, Gil, Jimenez, Jiron, Lopez, and Morales.  After identifying them as targets, none was never again mentioned in the affidavit.  From the affidavit, it does not appear that law enforcement made any effort to investigate his activities through traditional means before

36

being targeted by the wiretap.

The affiant concealed from the wiretap judge that Diaz had been arrested for assault with a deadly weapon, Bates 1882-85, 1897-1900, providing law enforcement with additional leverage to obtain information from Diaz.

The affiant concealed from the wiretap judge that law enforcement had intercepted Gil speaking on the telephone from inside prison, Bates 3347-48, a fact that would have prompted a reasonable wiretap judge to question whether a wiretap was really needed to intercept Gil.

The affiant concealed that Espinoza had been identified as the driver in a robbery that resulted in the arrest of two other Black Angels members, Bates 2758-2829, a fact that would have given law enforcement a pretext for contacting Espinoza and others about Espinoza's activities.

Sanchez and Vasquez were both identified as continued wiretap targets even though both were taken into custody on August 1 for their role in a liquor store robbery. Bates 759-60.  Law enforcement ignored the possibility of intercepting their jail calls or using the arrest as a pretext for interviewing them on additional topics.

The affiant concealed that Barajas had been confirmed as being on active parole and therefore amenable to contact through a parole search.  Bates 4363-69.  Although the only discovery produced by the government confirming Barajas's parole status was dated August 18, 2009, reason reasonably diligent law enforcement officers would have ascertained this fact well before six months of wiretapping had been undertaken.[22]  There is no indication law enforcement attempted to conduct a parole search of Barajas prior to the August 2009 wiretap.  The only other investigation of Barajas was the fact that his call records documented 15 telephone conversations with his niece during a 20 day period.  Bates 778-80.

The only time David Hernandez fell under the gaze of traditional law enforcement

---

[22.] Indeed, the government's discovery does not even suggest that the wiretap team ascertained Barajas's parole status.  It was simply a fact relayed to them by jail officials after Barajas

1    efforts was the single incident when law enforcement attempted to monitor Rivera's

2    attempted purchase of a firearm near Prieto's residence.  Bates 782-88.  As they were

3    simply following up on a phone call they had intercepted, this was not even an instance

4    where law enforcement was attempting to employ traditional means before resorting to

5    wiretapping.

6           Law enforcement documented no attempt to conduct surveillance of Daniel Reyes

7    prior to continuing electronic surveillance of him with the August 2009 wiretap.

8    Although he was booked in connection with the robbery for which Sanchez and Vasquez

9    were arrested, he was released without being charged with that crime.  Bates 760, 796.

10   Although he was found in possession of a firearm when he was arrested, and admitted

11   knowing of its possession, he was not charged with any firearm violation.[23]

12          Although subjected to several instances of surveillance, law enforcement obtained

13   a break when they arrested two individuals who just purchased drugs from Rivera.  Law

14   enforcement failed, however, to follow up by questioning both individuals, released one

15   of the individuals without questioning, and failed to file charges against either of them.

16   Bates 791-95.  Finally, on August 6, Rivera was subjected to a parole search, yielding

17   discovery of a half-pound of methamphetamine, and taken into custody.  Bates 798.  The

18   affiant offered no reason why further investigation of Rivera's activities could not be

19   pursued under the auspices of his parole supervision.  The affiant offered no reason why

20   law enforcement needed to target Rivera's communications with a wiretap when Rivera

21   was being detained in custody and could be monitored through jail phones.

22          No less significantly, the affiant concealed from the wiretap judge that law

23   enforcement had observed Rivera contacting Peter Alvarez and 6 other potential

24   informers on the afternoon of August 6 but failed to contact any of them or identify any

25

26   ─────────────────────────
     attempted to visit his incarcerated son.  Bates 4363-69.

27     [23.] The government has failed and refused to produce discovery relating to the arrest of Sanchez
     and Vasquez and the detention of Reyes which may yield further evidence of misrepresentations
28   or misleading statements to the wiretap judge.  E.g. Bates 3006-17, 3046-57 (withheld from the
     defense).

of them other than Alvarez.  Bates 1390-93.  The affiant also concealed that Peter Alvarez, Bobby Reyes, and Jessica Medina were present at Rivera's house during the parole search and that law enforcement made no attempt to interview them.

Besides reviewing the toll records on his phone, Bates 774-75, the only efforts made relating to Hurtado was a traffic stop that yielded a misdemeanor citation and confirmation that Hurtado was on active parole.  Bates 770.  Two weeks later, law enforcement conducted a single attempt to conduct surveillance at Hurtado's home. Bates 796-97.  Although confirming he was on parole, law enforcement made no attempt to conduct a parole search or to use a parole search as a means of contacting Hurtado without disclosing other details of their investigation.

Raul Prieto came to law enforcement's attention only because Rivera walked into Prieto's home and hid a gun inside the latter's home.  Bates 752, 786.  Law enforcement made no apparent effort to interview Prieto about the incident or his relationship to Rivera, to interview his family or neighbors, or to determine if Prieto was on probation or parole.

Law enforcement learned that Cornejo was receiving jail calls from an inmate at the Los Angeles County Jail that, they inferred, related to drug dealing activity, Bates 779-80, and received tips from an informer about her phone number and relaying that she was dealing drugs, Bates 750, 805.  Law enforcement obtained a pen register for Cornejo's telephone.  Bates 810.  The affiant identified no other investigative activity aimed at learning about Cornejo's activities.

In furtherance of the investigation of Virginia Gil, the affiant stated that law enforcement had conducted surveillance on Navarro on July 30, 2009 and observed him leave $100 under her doormat, Bates 790-91, although no discovery to corroborate that allegation has been produced to the defense.  The affiant mentioned conducting a trash search of Virginia Gil's residence on July 21, 2009, Bates 621, but concealed from the wiretap judge that the trash search yielded phone numbers for potential contacts (that law enforcement did not follow up on) and various account statements and receipts that could

have provided a basis for a financial investigation, Bates 1247-48, 1372-73.

After conducting a traffic stop of Inez Meza on August 6 following his meeting with Rivera and seizing an ounce of methamphetamine from Meza, Bates 798, law enforcement made no effort to exploit this situation but instead pleaded that charges *not* be filed.

Although identifying Estrada as a new potential target subject based primarily on her status as a potential victim of Navarro's alleged extortion efforts, while also suggesting that she was involved in illegal drug dealing, law enforcement made no effort to investigate her by traditional means.  The only mention of Estrada was that one of her phone calls had been intercepted on July 11 (a week before the previous wiretap and five weeks before the August extension) and that toll data indicated 10 phone calls between her and Hurtado.  Bates 775.  One could fairly read the affidavit as suggesting that law enforcement made no effort to investigate Estrada whatsoever.

Although learning that Officer Gabe Gutierrez had cultivated a relationship with Cardenas, whose membership in the Black Angels had been involuntarily terminated and who feared that he was going to be targeted for death, Bates 778, 800, without ascertaining what information Officer Gutierrez might be able to develop, the affiant summarily dismissed the idea of trying to obtain any information from Cardenas.  Bates 802.

B.     The Investigation of Unexplained Targets

Law enforcement identified Boxer, El Oso, and Rude Boy as potential targets. Law enforcement never explained who these individuals were, why they should be targeted, or what steps law enforcement had taken to investigate them short of a wiretap.

C.     The Investigation of Alex

Jose Romero was identified as a new potential target, Bates 752, but law enforcement made no effort to investigate him by traditional means besides an accidental

40

episode of surveillance where law enforcement was attempting to monitor someone else. Bates 789-90.

The affidavit identified Salvador Martinez as a target but suggested no attempt was made to pursue the investigation of him by traditional means.  The only advancement of the investigation of Martinez was the fact that he was intercepted speaking to Jose LNU (Silva).  Bates 766-67.

The only development as to Silva (Jose LNU) was a single instance of surveillance over three weeks before the August wiretap.  Bates 788.  The affiant concealed that one other instance of surveillance was performed where Silva was observed with 4 other potential informers who law enforcement made no effort to identify or contact.  Bates 4082-85.

The affiant added several potential targets – Carnicero ,Dan, Justine, Kim, Mano and Masacote – based only on the fact that they were intercepted in a single telephone call with another target of the investigation.  Bates 758-59, 761-62, 765, 768-69, 774-75.

The affiant affirmed law enforcement's desire to continue monitoring all of the previous targets without suggesting that law enforcement had taken any traditional investigative efforts short of a wiretap.  The individuals in this category include Cabezon, Richard Castorena, Teresa Castro, Deborah Cortez, Larry Cuevas, Lucio Diaz, Victor Felix, Gilberto Gutierrez, Jose Gutierrez, Steven Hernandez, Steven Hoyos, Carmela LNU, Mario LNU, "M," Gabriel Macias, Kevin Alejandro Martinez-Gonzalez (a.k.a. Chipo who the affiant confirmed had not had any contact with Alex and ceased supplying drugs to Alex for more than six months), Sara Misquez, Octoavio Pena, Paul Onsurez, Patrick Orosco, Ray Perez, "Red Eye", Roberto Sosa, Armando Venegas, and Shawn Young.

## VIII.  The Wiretaps, and the Evidence Derived Therefrom, Should Be Suppressed

The affiant failed to demonstrate necessity for the vast majority of the wiretap targets throughout the investigation.  Moreover, the affiant seriously misled the wiretap

41

judge as to the facts relating to reasonable alternative avenues of investigation short of a wiretap.

In dismissing the traditional investigative techniques, the affiant relied primarily on general "boilerplate assertions are unsupported by specific facts relevant to the particular circumstances of this case [that] would be true of most if not all narcotics investigations. This is simply not enough." *Blackmon*, 273 F.3d at 1210. The affiant attempted to justify a wiretap based on his theory that a traditional methods would be more effective or efficient if employed *in conjunction with* a wiretap, even though Congress made pellucidly clear that it expected the traditional methods to be employed *prior to* resort to a wiretap.

Law enforcement disregarded the parole status of many potential targets and ignored common methods of obtaining access to interviews and the targets homes short of a traditional search warrant. Law enforcement brazenly misled the wiretap judge about the circumstances surrounding the possibility of a trash search at Alex's residence and cavalierly disregarded conducting trash searches at other known locations. Law enforcement unreasonably disregarded traditional search warrants until the end of the investigation. Law enforcement relied only sporadically on mail covers or monitoring calls placed from incarcerated individuals. Surveillance was typically limited to information gleaned from intercepted calls rather than serving as the precursor to intercepting calls. In numerous instances, such as the funerals of Vega and Rodriguez, law enforcement cavalierly ignored opportunities for group surveillance that were highly likely to be productive in assisting in identifying members of the group. Law enforcement had access to numerous potential informers, all of whom the affiant summarily dismissed without even interviewing them and, in some instances, affirmatively misleading the wiretap judge about the informer's historical willingness to provide information and law enforcement's own interference or undermining of the informer's ability to serve as an informer.

Although each traffic stop leading to discovery of drugs and each arrest provided

law enforcement with an opportunity to recruit potential informers, law enforcement did not even consider doing so.

In short, law enforcement had innumerable opportunities to conduct an investigation by traditional means before resorting to wiretaps (if indeed the investigation could not be completed without the wiretaps) but dismissed or squandered those opportunities.

Respectfully submitted,

KESTENBAUM EISNER & GORIN LLP

Dated: September 17, 2012          /S/ ALAN EISNER

ALAN EISNER
Attorney for Defendant
JUAN GIL